# Staunton

## Ebner R. Duncan, etc. v. John S. Barbour.

September 8, 1948.

Record No. 3360.

Present, Hudgins, C. J., and Eggleston, Spratley, Buchanan and Staples, JJ.

*Hunton, Williams, Anderson, Gay & Moore, Archibald G. Robertson* and *Ralph H. Ferrell, Jr.,* for the plaintiff in error.

*Christopher B. Garnett, Charles Pickett* and *James Keith,* for the defendant in error.

HUDGINS, C. J., delivered the opinion of the court.

Plaintiff, by this writ of error, seeks to reverse a judgment pronounced against him in an action he brought for the recovery of broker's commissions alleged to be due for securing a purchaser for certain real estate owned by defendant.

The one assignment of error—the insufficiency of the evidence to support the judgment—requires a review of all the evidence.

Litigants waived a jury and submitted their case to the trial judge, whose finding of fact on evidence introduced before him is as binding upon this court as a jury's verdict which he has approved. The question before us is not whether the evidence would have supported a finding of fact for the losing party, but whether the record contains substantial credible evidence which will support the finding of the trial judge. The rule by which the evidence must be tested is especially important in this case because R. V. H. Duncan, salesman for his real estate firm and hereinafter referred to as broker, and John S. Barbour, the defendant, an able, well-known lawyer hereinafter referred to as owner, were the only two witnesses who testified on the decisive issues, and their testimony was in direct conflict.

The evidence stated from the owner's point of view may be summarized as follows: The broker, with offices in Alexandria, twelve miles from Fairfax, in February, 1947, called by the owner's office in the town of Fairfax to see about commissions due him on the sale of other lands that the owner had consummated under orders of the Circuit Court of Fairfax county. During this interview the broker told the owner that the local real estate market, "Was very fine, getting good prices for property." The owner then said he believed he would be willing to sell all his real estate in the town of Fairfax if he could get $175,000 for it. They then discussed the terms and conditions of the proposed sale of the property in detail. The owner explained to the broker at length that if he sold the property at the named price, a large per cent would be profits; and if he had to account for all or a substantial part of the profits in one

year, his income tax bracket would be raised to 50 or 80% and he was not willing to do that. He then specifically instructed the broker that his terms of sale were 20% cash, the deferred payments to be spread over a period of not less than five years, and bearing interest at 4½% payable semi-annually. He further stated that he did not want any payment greater than 20% to come due in any one year, and as an additional reason for so fixing the terms, said he had had difficulty in finding satisfactory investment for funds in his hands. The owner instructed the broker not to advertise the property for sale as he did not want any publicity about it, and anyone the broker might interest in the property should be sworn to secrecy.

It was agreed that in the event a sale was consummated the owner would pay the broker 5% commissions.

The broker succeeded in getting the members of the law firm of Senator John W. Rust interested in the purchase of the property. Under date of February 24, John H. Rust, the son of Senator Rust, wrote the broker a letter which contained an offer from Senator Rust, John H. Rust, John C. Wood, and John C. Webb to buy the property for $160,000, $5,000 to be paid on the signing of the contract, $41,400 additional amount to be paid on the date of settlement, which settlement should be made within ninety days, the balance of $113,600 to be secured by a first deed of trust and evidenced by ten notes payable annually one to ten years after date, the notes bearing interest from date at 4% payable annually. The purchasers reserved the right to anticipate any or all of the deferred payments, the vendor should join in a release to any of the property sold, and should agree to join in deeds of dedication.

On receipt of this letter, the broker, without notifying the owner that he had received the offer, conferred with the three junior members of the Rust law firm in their offices in Fairfax, prepared a contract of sale of the real estate, incorporated therein the specific terms made by the partners, and mailed the contract for the approval and signature of Senator Rust who was then in Florida. Later,

it was signed by all four members of the partnership. On March 3, 1947, the broker took the signed contract to the office of the owner and offered it and a check for $5,000 to him for acceptance. The owner without a moment's hesitation refused to consider this offer as it did not comply with the terms and conditions of sale previously fixed by him.

During one of the three interviews that the parties had before 1 P. M. on March 3, the owner stated that from the manner in which the property was described in the contract, it might be construed that the proposed sale was by the acre and he wanted the sale to be in gross so that he would not be responsible if there were any shortage in acreage. The broker took the contract and check and left the owner's office. In a short while he returned stating that he had gotten the three proposed purchasers who were in Fairfax to agree to raise the price to $175,000. He offered a new contract which he had prepared, fixing the purchase price at $175,000, and the rate of interest for deferred payments at 4½% payable annually, and said that he, the broker, had been unable to formulate the owner's idea about the area to be conveyed and asked him to put it in his own language. Thereupon the owner wrote in pencil at the end of the description, "This is a sale in gross, and not by the acre."

The owner read the contract hastily but his attention was not called to the fact that the contract provided for the cash payment to be 29% and not 20%, that he right was reserved to the proposed purchasers to anticipate the deferred payments, and the release clause. However, the owner said that he would not agree to the release clause being incorporated in the contract, but he knew Senator Rust and he thought that he and the senator without written stipulations could work out a satisfactory arrangement if the occasion arose.

The owner was under the impression that the broker was getting information to prepare a contract in accordance with the terms and conditions he had prescribed and had specif-

ically and repeatedly told the broker he desired. The owner stated that he understood that "he (the broker) was making up an offer to be made to me by John W. Rust, and said it would have to go back to Florida to be signed by Mr. Rust, and would then be presented to me for acceptance or rejection."

When the owner returned home on the evening of March 3, 1947, he discussed with his wife the possibility of Senator Rust and his partners buying the property; his wife became upset and told her husband that she did not want to sell her home. After he saw how upset she became over the very thought of the sale, he determined that he would stop the negotiations for sale of the property. Early next morning, March 4, he phoned and revoked the authority of the broker to proceed with the negotiation of the sale, and told him not to make any other efforts to interest Senator Rust. The broker raised no objection, and on March 5, he called by the owner's office where they discussed the matter in a very friendly manner. The owner told the broker that he regretted that the necessity had arisen for compelling him to revoke the broker's authority to consummate a sale, and that, since both parties had acted in good faith, he was willing to pay the broker a reasonable amount for his trouble and offered him a check for $500. This the broker declined and said he would have to take the matter up with his firm in Alexandria. The broker then suggested the possibility of selling a part of the real estate described.

On March 7, the broker returned to the owner's office and discussed with him the possibility of selling all of the real estate in question except the home. The owner stated that this might be done. During the interview the broker took from his pocket a check and the second contract which had been signed by Senator Rust and his three partners. He said to the owner that it was an acceptance of the contract he had sent to Senator Rust, to which the owner replied: "That is water over the mill, and it is unnecessary to talk any more about that."

Negotiations for the sale of a part of the property con-

tinued without success for "a week or so." When it be-
came apparent that the parties could not or would not agree
upon the terms of a sale, the broker demanded payment for
his commissions which demand was promptly refused.
Later, this action was instituted.

The broker contends that he procured purchasers for the
property upon terms which the owner accepted prior to the
revocation of his authority.

This contention is based to a large extent upon the broker's
testimony as to the terms of his employment and on his
version of the interviews he had with the owner on March
3. The broker stated that he was given the exclusive right
to sell the property on a 5% commission basis, the total
purchase price to be $175,000 29% cash, the balance to be
divided "over a period of at least five years, bearing 4½%
interest," and that the owner stated his reason for the small
cash payment and the extended time of the deferred pay-
ments was for income tax purposes.

Under the broker's version of his contract of employ-
ment, it was not necessary for the sale to be consummated
before he was entitled to his commissions. The owner on
the other hand, testified that the terms of employment were
such that the broker was not entitled to his commissions
unless the sale was actually consummated.

■ The essential difference between the two classes of
contracts was discussed at some length by Mr. Justice Eg-
gleston in *Richeson* v. *Wilson*, 187 Va. 536, 47 S. E. (2d)
393, and *Snider* v. *New River Ins., etc., Corp.*, 187 Va.
548, 47 S. E. (2d) 398, wherein it was held that ordinarily
the undertaking of a real estate broker is to procure a pur-
chaser ready, willing, and able to buy the property upon
the terms stipulated by the owner. Under such a contract
of employment the broker is not required to procure a writ-
ten contract signed by the purchaser as a condition precedent
to his right to recover commissions; nor does his right to
compensation depend upon the consummation of sale.

■ Where the contract specifies that commissions are
to be paid on consummation of the sale, however, it was

said in *Snider* v. *New River Ins., etc., Corp., supra,* that: "It has long been settled in this State that a broker employed to *sell,* as distinguished from a broker employed to *find a purchaser* ready, willing and able to buy, is not entitled to compensation until he effects a sale or procures from his customer a valid and enforceable contract of sale. The procurement of a verbal offer or agreement to purchase is not sufficient."

It is evident that upon the conflicting testimony, the trial court found, as it had a right to do, that, under the contract of employment, the broker was not entitled to compensation until a sale was actually consummated or unless the consummation was prevented by the arbitrary action of the owner.

As we view the record, the dominant issue is whether the owner agreed to modify his original terms and conditions of sale and to accept those offered by the proposed purchasers. If he did so agree, the revocation of the broker's authority came too late. If he did not consent to these terms, then the broker has never presented the owner with a signed written contract containing an offer to buy upon the terms and conditions fixed by him; nor has the broker put the owner in communication with such a purchaser.

The first offer to purchase that the broker received was in the form of a letter from John H. Rust. This offer differed from the terms and conditions specified by the owner in the following particulars: (1) the total purchase price offered was $160,000 instead of $175,000; (2) it provided for a cash payment of 29% instead of 20% of the purchase price; (3) the rate of interest on the deferred payments was fixed at 4% payable annually instead of 4½% payable semi-annually; (4) the offerees reserved the right to pay all cash at any time they desired rather than to spread these payments over a period of not less than five years; (5) the offerees required the owner or his assigns to join in deeds of dedication whether of streets, alleys, or parkways; and (6) a release clause for so much of the property as might be resold.

The only testimony tending to establish the contention that the owner agreed to the terms offered is the statement of the broker that after the owner rejected the first offer, he prepared another contract raising the offer to $175,000 and increasing the rate of interest from 4 to 4½%, which unsigned contract he took to the owner and asked him to put in a satisfactory clause about the area to be conveyed. It was then the broker claims the owner read the contract and expressed himself as satisfied with it as written.

The owner, on the other hand, while admitting that he hastily read the contract, said that he did not understand that the unsigned paper was intended to be in final form, nor did he understand that he was to approve it. He was not asked to sign it. He thought the broker was making up a contract, containing terms and conditions which he had specified, to be submitted to Senator Rust for approval; that on this particular occasion he discussed with the broker the area to be conveyed and the release clause which he did not desire to be incorporated in a written contract; that the other two provisions, namely the small cash payment and the period of time over which the payment of the balance was to be paid, was so thoroughly understood that there was no necessity to discuss them again. The owner stated positively that he had never knowingly agreed to change the terms and conditions of sale fixed by him in his original interview with the broker, and that, "He (the broker) has never presented me a contract in consonance with my authority to him, although it may appear that he did present me a paper which I did not read so carefully as I should have done, but which I think now, and thought then, that he should have called my attention to the particulars if he was presenting a new draft of a contract in which they had not been followed."

A broker is an agent of the owner in negotiating the sale of the owner's property. As such, he owes to his principal the duty to exercise the utmost good faith towards him. *Lee* v. *Patillo*, 105 Va. 10, 52 S. E. 696. Judge Prentis in *Mitchell* v. *Hughes*, 143 Va. 393, 130 S. E. 225,

quoted the following excerpt from the opinion in *Veasey* v. *Carson*, 177 Mass. 117, 58 N. E. 177, 53 L. R. A. 241, 244: "The general rule is well settled that a broker must act with entire good faith towards his principal, and he is bound to disclose to his principal all facts within his knowledge which are or may be material to the matter in which he is employed, or which might influence the principal in his action, and, if he has failed to come up to this standard of duty, he cannot recover."

The broker was fully advised of the terms and conditions of sale fixed by the owner. He knew the owner's reasons, for insisting upon these terms and conditions. The four partners with whom he was negotiating in their original letter to the broker set forth the terms and conditions upon which they were willing to buy, terms which were quite different from those fixed by Mr. Barbour. These partners at all times insisted that they be given the right to anticipate the payment of any part or all of the unpaid purchase price, and that the owner and his assigns should be required to execute deeds of release whenever required. Each of these four partners, when called as a witness, testified that he would not have offered to buy and would not have completed the purchase if these terms were not acceptable to the owner and set forth in the contract and deeds.

The broker knew of the vital differences between the terms and conditions fixed by the owner and those the offerees desired to incorporate in the contract. He knew that, if more than 30% of the purchase price was paid in any one year, the owner's plan for income tax purposes would be frustrated. He also knew that the offerees contemplated a resale of a part or perhaps all of the acreage; and in order to carry this purpose into effect, it was necesary for them to have the right to discharge at their pleasure any or all incumbrances upon the property.

Under these circumstances it was the duty of the agent to disclose to his principal the vital differences in the terms and conditions of sale contemplated by the parties. This duty was not discharged by simply handing to the

owner an unsigned contract and directing his attention to one specific change. It was his duty to inform his principal of all facts which might influence his principal in accepting or rejecting the offer. An agent is not entitled to recover until he has fully performed this duty to his principal.

The statements of Senator Rust and his associates to the effect that they would not agree to purchase the property unless they were given the right to anticipate all deferred payments of the purchase price, and the statement of the owner that he did not and would not agree to accept such anticipated payments because such an agreement would enable others to destroy his plan for distribution of the profits over a period of not less than five years, indicate that the discussions of the contemplated sale never passed beyond the stage of negotiation. This evidence supports the finding of the trial court to the effect that the owner was within his rights when he revoked the authority of the broker to sell the property.

These conclusions are decisive of the case and render it unnecessary to discuss the question of estoppel raised by the broker in his briefs.

The judgment is affirmed.

*Affirmed.*