## Richmond

THOMAS C. BARNES v. W. R. MOORE, ADMINISTRATOR, ETC.

June 14, 1957.

Record No. 4671.

Present, All the Justices.

The opinion states the case.

*A. S. Harrison, Jr.* and *Samuel H. Allen,* for the plaintiff in error.

*W. E. Neblett,* for the defendant in error.

SPRATLEY, J., delivered the opinion of the court.

Annie M. Buchanan instituted this proceeding seeking to recover of Thomas C. Barnes and A. C. Love $7,934.18 for the manufactured value of certain timber and trees, alleged to have been unlawfully, wrongfully and knowingly cut and removed by the defendants from her lands. Subsequent to the filing of her motion for judgment, Mrs. Buchanan died, and the action was revived and continued in the name

of her administrator, W. R. Moore, sometimes hereinafter referred to as plaintiff. Barnes, in defense, admitted that he cut and manufactured the trees into lumber; but alleged that he did so under a *bona fide* claim of right of title. Love denied the trespass alleged against him and pleaded not guilty.

By consent of the parties, the court proceeded to hear and determine the matter without the intervention of a jury. After having heard the evidence and the argument of counsel, on motion of the plaintiff, it dismissed the action as to Love, and being further of the opinion that Barnes was guilty of gross negligence in cutting and removing the trees, entered a judgment against Barnes in the sum of $3,255.53, the ascertained manufactured value of the timber.

The assignments of error involve only one question, and that is whether Barnes was guilty of gross negligence in committing the trespass alleged.

In view of the judgment of the court in favor of the plaintiff, the evidence and all reasonable inferences therefrom, under settled principles, must be viewed by this Court in the light most advantageous to the plaintiff. The judgment cannot be set aside unless it appears from the evidence that it is plainly wrong or without evidence to support it. Virginia Code, § 8-491. Burks Pleading and Practice, 4th Ed., Appellate Procedure, § 428, page 819, *et seq.*, and cases cited. Therefore, the "question before us is not whether the evidence would have supported a finding of fact for the losing party; but whether the record contains substantial credible evidence which will support the finding of the trial judge." *Duncan* v. *Barbour*, 188 Va. 53, 55, 49 S. E. 2d 260.

It should also be borne in mind that every trespass is *prima facie* willful, and where the trespass is conceded, as in this case, the burden of proof is on the defendant to show that the trespass was not willful. *Wood* v. *Weaver*, 121 Va. 250, 260, 92 S. E. 1001; *Bostic* v. *Whited*, 198 Va. 237, 239, 93 S. E. 2d 334; 18 M. J., Trespass, § 19, page 564.

The facts are not greatly in dispute.

The evidence showed that Annie M. Buchanan owned 81.17 acres of land in Lunenburg County, Virginia, described as Tracts 21 and 27 of the Beech Forest Tract. It had been surveyed several times, and its boundary lines were well marked by iron pins, buggy axles and chopped trees. There never had been any dispute about the lines prior to the action here complained of, and as one witness testified they could be readily found by lantern light.

A. C. Love, of the same county, owned eight tracts of main Beech Forest Tract, which virtually surrounded the land of Mrs. Buchanan. In the fall of 1954, Love sold to Lee Cabiness by oral contract the timber on his property for $10 per 1000 feet. Cabiness began to cut the timber, especially the larger pine and poplar trees. On December 22, 1954, Cabiness went to Barnes and told him that he did not have the necessary equipment to cut the timber and asked the latter to take over the contract. Barnes thereupon sent his foreman, H. E. Daniel, with Cabiness, to look at the timber and to obtain a written contract from its owner, if Daniel thought it worth acquiring.

According to Barnes, Daniel and Cabiness went to the land in question, and Cabiness showed Daniel the lines, stating the area contained about three hundred acres, and that the land was owned by A. C. Love. The two of them went to Victoria and found Love near his home. Cabiness obtained a bottle of whiskey for Love, and after the latter had taken a drink, they began negotiations. Daniel reported to Barnes that Cabiness told Love he had shown Daniel certain lines of the property, and Love agreed that the lines were correctly stated. Love did not go to the property, or point out the lines to Daniel. Love agreed that Barnes might take over the contract of Cabiness at $10 per 1000 feet, payment to be made when the cutting was completed, but refused to sign a written contract. Other than the time of payment, no terms and conditions were specified at this conference. The lines of the land were not stated with any particularity; no acreage was mentioned; no estimate made of the amount of the timber to be cut; or the time when the cutting should be compelted. Upon receiving Daniel's report, preparations were made for cutting the timber, and the cutting began early in January, 1955. In the meantime, Barnes discussed, in a general way, the question of the boundary lines of the land with some of the neighboring landowners.

Weather conditions caused the discontinuation of timber-cutting by Barnes during the latter part of January, and thereafter he went to the area to inspect the roads. On this trip Barnes met E. N. Wallace, who lived in the Beech Forest neighborhood, and asked Wallace to show him the boundary lines of the Love land upon which he had bought the timber. Wallace went with Barnes to the area in question, pointed out the lines of the Buchanan property and told Barnes he was cutting on the Buchanan land. He added that Dan Buchanan was looking after the land for his mother, and that Dan Buchanan,

James Buchanan, or Jake Buchanan would tell him that the land upon which he was cutting was their mother's property. Barnes did not go to see any of the Buchanans. Instead, he induced Love to go with him and Herbert Gilbert on the next day to the tract where the cutting was done. This was the first time that Love had left his home for a number of years. Barnes said he showed Love the lines designated by E. N. Wallace as the Buchanan land, and that Love stated the property belonged to him. On several occasions subsequently, Barnes again talked to Wallace about the boundary lines, insisting that he was cutting on the land of Love. Wallace, on each of such occasions, told him that he was in error, that it was the Buchanan property, and suggested that he go to the clerk's office of the circuit court and ask the clerk about the matter. Barnes did not do this.

About the middle of February, 1955, Dan Buchanan discovered that Barnes had been cutting the timber on his mother's property. He confronted Barnes with this, and Barnes told him he had purchased the timber from A. C. Love. The next day Barnes brought Love to the scene of the cutting, where a conference took place between the three men. According to Dan Buchanan, Love first strenuously denied that he had sold Barnes the timber at any time. Later on, under questioning of Barnes, Love both admitted and denied that he had sold the timber to Barnes, and that he, Love, owned the land in question.

There was considerable evidence as to the value of the different kinds of trees on the Buchanan land, both before and after converted into lumber. They were said to be of fair or medium value compared with other timber in the same county. Witnesses for the plaintiff testified that $10 per 1000 feet, on the stump, was much less than the real value of the predominant pine, poplar and oak trees. Love had previously, about 1950, sold the timber on his land, and Cabiness purchased only what was left in 1954.

A. C. Love had been a prominent citizen and business man of Lunenburg County for many years. He was eighty-two years of age, blind in one eye, with defective vision in the other, and feeble both physically and mentally. He had given up his business affairs about ten years ago, and such matters were attended to by his wife and other members of his family. He was kindly disposed, addicted to drinking alcoholic beverages whenever available, and easily influenced by other people, especially when drinking. His physician testified he was of the opinion that he was not competent to transact

business matters, and that while he was rational at times, he was confused and irresponsible at other times. These conditions surrounding Love were generally known in his community. Barnes and Love were kinsmen. Barnes knew him quite well and referred to him as "Cousin Allen."

Lee Cabiness is a timber operator in a small way, cutting the trees and selling them to manufacturers. He had conducted a number of such operations in Lunenburg County. The evidence shows that his general reputation for honesty, truth and veracity was bad, and that he was regarded as an unreliable person. Barnes knew Cabiness and had the opportunity to be well aware of the latter's general reputation.

Barnes had been engaged in the lumber business in Lunenburg County for about fifteen years, and the evidence is that he is a man of honesty and integrity. He deposited in the trial court the sum of $971.28 for 65,045 feet of timber, which he admitted was cut by him or his agents. He testified that he cut the timber under the mistaken belief that he was working on the Love land, in that he relied upon the statements of Cabiness, Love, and certain other persons he interviewed. He insisted that his mistake was not induced by gross negligence, and that he was responsible only for the stumpage value of the trees, the amount he tendered in payment.

Neither Cabiness, Love nor Herbert Gilbert testified in the case. The exact whereabouts of Cabiness was said to be unknown at the time of the trial.

The principles of law applicable are not in dispute. It is conceded by the parties that the rule stated in *Wood* v. *Weaver, supra,* 121 Va. at page 261, a leading case on the subject, is controlling. There we said, in part, "To be willful the act of trespass itself must be intentional, to be sure, for if done accidentally or by inadvertence or by mistake not induced by gross negligence, it will not be willful. (Citing cases) On the other hand the act may be felonious, or fall short of that and be a theft, or short of that and be a fraud, and yet short of that and be 'in bad faith' or 'not in good faith,' and still short of that and be grossly negligent of the property rights of others, with respect to exercising proper diligence to ascertain the true identity, location or title to property—as when the act is wanton, or reckless—and in all these degrees of disregard of the rights of others the act will be willful. But a criminal intent is not essential, nor even a fraudulent intent. The act need not rise above the degree of gross negligence of

the property rights of others to constitute the trespass a willful trespass. * * *"

See also *Bostic v. Whited, supra; Pan Coal Co. v. Garland Pocahontas Coal Co.*, 97 W. Va. 368, 125 S. E. 226.

If the cutting of the trees was merely inadvertent, or done through mistake under a *bona fide* claim of right or title, without gross negligence, Barnes was only liable for the stumpage value of the trees. However, if the evidence was sufficient to justify the belief that Barnes' error or mistake was committed in bad faith, or recklessly, or in willful disregard of the rights of others, or induced by his utter failure to do what an ordinary, reasonable, and prudent man would have done, in view of all the surrounding circumstances, then his conduct constituted gross negligence, and he was liable for its manufactured value.

Barnes cites and relies upon the cases of *Wood v. Weaver, supra*, and *Pan Coal Co. v. Garland Pocahontas Coal Co., supra,* to support his contention that he was not guilty of bad faith or gross negligence. The facts in those cases differ from those here.

In *Wood v. Weaver, supra,* the trees were cut by employees of the defendant after an injunction had been awarded and served upon him prohibiting such cutting. The defendant testified that immediately upon being served with the injunction order, he notified all of his employees to cease forthwith from cutting any timber on the premises in question. Under the facts stated in the opinion in that case, the trespass was held to be non-willful, and the judgment of the trial court in correcting an error of the jury as to the amount of the award, because of an erroneous instruction given them, was affirmed.

In the *Pan Coal Co. v. Garland Pocahontas Coal Co.* case, *supra,* the judgment of the trial court was reversed for erroneous instructions given or refused, and the case remanded for the jury to determine "whether the defendant, on the one hand, acted in good faith, honestly believing it had a right to mine the coal, or on the other acted in bad faith thereby intending to gain an unconscionable advantage of the plaintiff." 125 S. E. page 233.

Here, Barnes, an intelligent and experienced operator in the lumber business, had before him multiple facts and circumstances to put him on inquiry as to the ownership of the land upon which his contract was to be performed. It is clear that he had doubt as to the identity and location of the land; but his doubt caused him to make only inqueries of a superficial nature. Instead of having the title to the land

examined, he relied upon the description given him by Cabiness, the confusing statements made by Love, and the general statements of several persons living in the vicinity of the land in question. The boundary lines of the Buchanan land were clearly marked. Even after Barnes was told several times by E. N. Wallace that he was trespassing upon that land, he, nevertheless, continued his cutting operations in disregard of that care and caution which an ordinary, prudent man would have exercised, which amounted to a willful and intentional disregard of consequences sufficient to justify the trial judge in finding that he was guilty of gross negligence.

The trial judge had the opportunity of seeing, hearing and observing the witnesses testify, and to evaluate their evidence, and we cannot say that his conclusion was not justified. Accordingly, the judgment of the trial court is affirmed.

*Affirmed.*