# Richmond

DONALD CAMERON CROUNSE v. ANEEN PARKER CROUNSE, NOW ANEEN PARKER GORMAN.

November 28, 1966.

Record No. 6226.

Present, All the Justices.

*T. Brooke Howard (Howard, Morris, Hancock, Mains & Howard,* on brief), for the appellant.

*Andrew B. Ferrari (Ferrari, Wrenn & Harrison,* on brief), for the appellee.

SNEAD, J., delivered the opinion of the court.

This controversy involves the question of the custody of Donald Cameron Crounse, Jr., now nine years of age, the child of the parties to this appeal.

Donald Cameron Crounse, the father, secured a divorce from Aneen Parker Crounse, the mother, on March 27, 1961. On October 31, 1961, the parties entered into an agreement providing that the custody of Cameron "shall be in Father and Mother jointly." The agreement further provided that the child should reside with the mother "during the period each year which begins with the day after Labor Day in September and ends with the day after the last day of school in May or June, as the case may be." By the agreement, the father was given elaborate rights of visitation during the period the child resided with the mother.

The agreement further provided that Cameron should reside with his father during "summer vacation period each year, beginning with the day after the last day of school in May or June, as the case may be, and ending with the day after Labor Day in September." The mother was given visitation privileges during the period the child resided with the father.

The agreement provided that "any dispute over the care, custody, or support of the Child" should be submitted to the Circuit Court of Arlington County, Virginia, for determination. The agreement was approved by the trial court in a decree entered on December 4, 1961.

On July 31, 1964, the father filed a petition alleging that Cameron had become "emotionally disturbed" and that because of the mother's "emotional instability . . . over a period of years" it would be to the best interest and welfare of the child to reside with the father. The petition prayed that custody of the child be awarded to the father, subject to reasonable visitation rights of the mother.

The mother filed a response and also filed a petition alleging that

since the date of the decree approving the agreement "there has been a sufficient and substantial change of conditions and circumstances clearly necessitating a modification of the existing custody agreement and decree." The petition further alleged that since the date of the decree "an emotionally unstable condition has manifested itself in Donald Cameron Crounse, Jr. . . . intensified by his living in 'two homes' and 'two worlds.'" The petition prayed that the custody of Cameron be awarded to the mother, subject to reasonable visitation rights of the father.

The chancellor heard the evidence *ore tenus* except for two short and unimportant depositions. The chancellor ruled that "neither the father nor the mother has borne the burden of showing that the welfare of the child requires that changes be made with respect to the possession of the child and visitation privileges of the parents under the existing decree and agreement except . . . with respect to the period of the possession . . . of the father during the summer school vacation periods."

The final decree of the trial court continued in effect the provisions of the custody agreement of October 31, 1961, subject to the modification that the period of Cameron's residence with the mother was extended to include the ten days following the close of the regular school year and the ten days prior to the beginning of the new school year, thus reducing the period of residence with the father during the summer vacation period. The father was granted this appeal.

The evidence shows that the marriage of the father and mother was a stormy one, filled with strife and discord which led to their ultimate separation when Cameron was three years old.

Following the divorce of the parties, both remarried. The father's marriage to his second wife produced a son, and he and his family reside in Fairfax County, Virginia. The mother has a daughter by her second marriage, and she and her family reside in New Canaan, Connecticut. The chancellor found that both parties "have established proper homes in which to rear their children."

Cameron resided alternately in the home of the father in the summer and the home of the mother during the school year, in accordance with the terms of the custody agreement. In the fall of 1961, shortly before his fifth birthday, he was enrolled in kindergarten in New Canaan. The following year, he entered first grade and had "great difficulty getting into" the routine of school life. In the first month,

he ran away from school on two occasions and his "explosions and his inability to accept authority were becoming out of the ordinary." However, "as he got back in the school pattern, the established pattern at home," his behavior "certainly improved."

In the fall of 1963, when he entered the second grade, Cameron became a serious behavior problem both in school and at home. Cameron was described by his teacher as "an extremely difficult child . . . very inattentive . . . unable to follow rules and regulations." In the classroom, there were "emotional outbursts of temper and many loud cries." In the mother's home, he was "a discipline problem . . . to a much greater extent" than ever before.

The mother held numerous conferences with Cameron's teacher in an effort to find a solution to his problem. Finanlly, both the mother and the teacher concluded that Cameron needed "professional help, medical help, someone who could tell us just what to do for this youngster."

Cameron's pediatrician, Dr. James Minor, was consulted, and he recommended an examination by Dr. Faith Ogdon, a child psychiatrist in New Canaan. Dr. Ogdon examined the child and found him to be "operating under extreme anxiety" and suffering from a neurosis. The doctor recommended that the child be given psychotherapy and suggested that "it might be helpful if his time was not so completely split between school in one home and vacation time in another."

Dr. Ogdon reported her findings to Dr. Minor, Cameron's pediatrician. Dr. Minor advised that Cameron's visitation periods in Virginia be shortened because, in the doctor's words, "this [is] what I think led to his school difficulties or at least precipitated them."

Cameron was examined by Dr. Jerome Schiller, a psychologist, who found the child to be "a severely disturbed youngster, who without psychotherapy will experience increased problems in living." Cameron was also examined by Dr. George Schultis, a psychologist, who undertook psychotherapy treatment of the boy just prior to the commencement of the present controversy. Dr. Schultis reported that "so far, Cameron just has not made even a reasonably good adjustment to his many changes in residence" and recommended that his summer visits in Virginia terminate "several weeks prior to the commencement of school."

Beginning in the fall of 1963, the mother contacted the father on a number of occasions concerning Cameron's behavior problems and

conveyed to him her desire that the period of the child's residence with the father be curtailed to not more than one month in the summer. The father was cooperative, visited New Canaan, and conferred with Cameron's teacher and the doctors who had examined him. The doctors conveyed to the father their belief that a shortening of the boy's summer visitation period with the father "was a step in the right direction in the treatment of the child."

The father questioned whether the prolonged visits with him were the cause of the child's emotional disturbance. In an attempt to resolve the question and with the consent of the mother, the father had the child examined by Dr. F. Regis Riesenman, a psychiatrist of Arlington, Virginia. Dr. Riesenman's opinion was that "the child from birth all the way through had always been disturbed."

Negotiations with respect to shortening the child's summer visit to Virginia continued between the father and the mother until the end of the school year in 1964. The father finally agreed to limit the summer visit to the month of July; but on June 30, without notice to the mother, the father removed the child from her home and brought him to Virginia, where he has since remained.

Following the child's return to Virginia, the father had him examined by Dr. William J. Morgan, a psychologist of Merrifield, Virginia. Dr. Morgan reported that the boy was "emotionally disturbed, ideationally unstable, and behaviorally untrained." Upon the advice of Dr. Morgan, the father enrolled the child in a private school. Since then, Cameron has made progress emotionally, socially and academically.

Meanwhile, the mother consulted Dr. Ogdon, the psychiatrist in New Canaan, about her own emotional stability and her adaptability as a mother. The doctor testified at the trial in the court below that the mother displayed "signs of immaturity." The doctor also interviewed the mother's present husband and described him as "warm and affectionate but sometimes finds it hard to deal with underlying hostility, which comes out in the form of teasing or kidding."

Dr. Ogdon referred the mother to Dr. Fred Brown, a psychologist of New York City, for psychological testing. After a series of tests, Dr. Brown reported that the mother had "a mixed neurotic character structure comprising hysteroid and compulsive features intermingled with narcissistic traits and ambivalencies that highlight the immaturity aspect of her personality."

The father testified at length concerning the actions of the mother

during their married life together. Dr. Morgan, the psychologist of Merrifield, Virginia, although he never saw the mother, reported that she "appears to be emotionally disturbed" and testified at the trial that she was "emotionally unstable" and "an unfit mother." Dr. Riesenman, the psychiatrist of Arlington, Virginia, who based his opinion solely on the report of Dr. Morgan, testified that the mother "has a hysterical neurosis . . . a very severe emotional reaction under certain situations."

The father points to the evidence just recited and contends that the trial court erred in refusing to award full custody of Cameron to him, subject only to the right of the mother to visit the child. Such was error, the father argues, because the trial court failed "to apply the standard tests prescribed by this Court" and because the court, under the evidence, could not "say that it would be to the best interest and welfare of the child to place it with" the mother. The father asserts that the mother is emotionally unstable and thus unfit; that the stepfather has hostile tendencies; and that the child should not, therefore, be permitted to reside in the mother's home where he "first contracted this condition."

The burden is upon the father not only to assert the error in the decree from which he appeals but also to establish such error by showing either where the chancellor failed to follow applicable principles of law or wherein the conclusion of the chancellor is unsupported by evidence. That conclusion was reached upon an *ore tenus* hearing of all the important evidence in the case and is entitled to great weight. It cannot be disturbed unless it is plainly wrong or without evidence to support it. *Forbes* v. *Haney*, 204 Va. 712, 715, 133 S. E. 2d 533; *Florance* v. *Florance*, 197 Va. 432, 435, 90 S. E. 2d 111.

The question for determination is not whether the evidence would have supported a finding of fact and a decree in favor of the father, but whether the record contains sufficient credible evidence which, upon the application of correct principles of law, supports the finding and decree of the chancellor, which the mother here seeks to sustain. *Barnes* v. *Moore, Adm'r*, 199 Va. 227, 228, 98 S. E. 2d 683; *Duncan* v. *Barbour*, 188 Va. 53, 55, 49 S. E. 2d 260.

The first difficulty with the father's position on this appeal is that there can be no doubt that the chancellor followed the correct principles of law in reaching his conclusion. The chancellor clearly set out those principles in his memorandum opinion where, quoting

from *Mullen* v. *Mullen*, 188 Va. 259, 269-270, 49 S. E. 2d 349, he wrote:

" 'The welfare of the infant is the primary, paramount, and controlling consideration of the Court in all controversies between parents over the custody of their minor children. All other matters are surbordinate.'

" 'The rights of neither parent take precedence over the rights of the child. The welfare of the child is superior to the wishes and personal desires of either of them. In considering their qualifications and fitness, we must look to their adaptability to the task of caring for the child; their adaptability to control and direct it; the age, sex and health of the child; its temporal and moral well being, as well as the environment and circumstances of its proposed home; and the influences likely to be exerted upon the child.' "

The other, and fatal, difficulty with the father's position is that the chancellor, in his memorandum opinion, made a number of findings of fact which are binding upon this court because they are supported by substantial credible evidence which we have not yet recited. The chancellor recognized that the mother had displayed instances of "erratic behavior" in her marriage with the father. And the chancellor noted the opinions of the experts concerning the mother's emotional condition. He found, however, that:

"Aside from these instances of past erratic behavior and the psychiatric evaluations, the mother is shown to be a good mother to the child born of her marriage to Mr. Gorman; that her home life is a normal and happy one; that she is active in church and that the child, Cameron, would, in her home, have the advantages that money can supply as well as loving care and a satisfactory environment. Substantial testimony was adduced from persons qualified by adequate opportunities for observation showing the mother to be mature or maturing and stable from an emotional standpoint and that she and her present husband have a happy home and a good relationship and are properly interested in working for the education and welfare of Cameron."

We turn now to the evidence in the record which supports those findings.

Although Dr. Ogdon testified that the mother displayed "signs of immaturity," the doctor went on to say that she was "in no way un-

qualified as a mother" and that a recent examination showed her to be "a more secure person." And Dr. Brown's diagnosis of the mother as having a "mixed neurotic character structure" was considerably tempered by his statement that his tests did not "stigmatize her as a person 'unfit' for motherhood."

Cameron's mother and stepfather testified in detail as to their home life together, their activities with Cameron and their concerned interest to try to solve his emotional problems. Their testimony reflects a lack of the turmoil in their lives such as existed in the mother's earlier marriage to the father and an absence of the "erratic behavior" on her part such as had been displayed in that past marriage.

Arnold F. Westwood, a minister in New Canaan, appeared as a witness for the mother. He stated that the mother and stepfather were members of his church; that the stepfather taught a Sunday school class; and that the mother at one time sang in the choir. The witness said that the reputation in the community of the mother and stepfather was the "highest sort" and that "they have been finely supporting the church."

Mary Faloney, Cameron's second grade teacher, journeyed from New Canaan to testify on behalf of the mother. The teacher stated that, on the numerous occasions she had conferred with the mother concerning Cameron's problems, she "never had any reason to believe she was at all emotional . . . I think if she was ever going to be emotional I think it could have happened during the conferences. I have never found her to be emotional."

Mary Fearon, a friend of the mother and stepfather in New Canaan, testified as a witness for the mother. She stated that she was a frequent visitor in the mother's home and the mother in hers. On one occasion, Mrs. Fearon and her children spent four days with the mother, Cameron and the stepfather; and another time she and her children spent a week with the mother and Cameron. The witness stated that the mother kept "a very lovely home" and that "she is an interested homemaker and a gardener." The witness described the care and attention given Cameron by the mother and the stepfather and observed that the mother handled the child "with a firm, loving hand."

Mr. and Mrs. Robert Erb of New Canaan also testified as witnesses for the mother. Mr. Erb was a business associate of the stepfather. He stated that the stepfather's reputation as a businessman was "excellent" and that he occupied an important executive position in a

large firm. Mrs. Erb was "a personal and close friend" of the mother. She said that the mother's home was "always attractive and neat" and that the mother "seems to be organized, calm." Mrs. Erb stated that when the mother's home burned to the ground in February of 1964, the mother "went through this great tragedy with equanimity." Mrs. Erb knew of Cameron's behavior problems and stated that the mother handled them by speaking "quietly to him, which was always effective" and that she had "never seen him disciplined in any noisy, threatening fashion whatsoever." She also said that the mother "is perfectly able to control her child."

There can be no doubt of the sad fact that Cameron suffers from an emotional disturbance. To say that the child "first contracted this condition" in the home of the mother, and thus to place the sole blame upon her alleged emotional instability, as the father attempts to do, is simply without support in the evidence. It is fairer to say that the evidence indicates that the child's condition was, in the words of Dr. Riesenman, "a product of the marriage" of the father and mother; and was intensified by Cameron's "living in two very different worlds," in the words of Dr. Ogdon, following the parents' divorce.

We do not need the opinions of experts to tell us that such a condition is, unfortunately, not unusual in a child who is the victim of a broken home. Cameron did not create the two worlds in which he now finds himself and he is unable, because of his tender years, to eliminate the confusion that is caused by his divided loves and loyalties. His problems can hardly be solved by judicial decree. If they are to be solved, as the situation now stands, it must be through the compassionate understanding and cooperation of those concerned with the child.

The evidence before us does not support the theory that Cameron would be so much better off in the one world of the father as to warrant isolating him from the mother's world. In situations like this, it is sometimes better to do as the late, respected chancellor did in this case. He wrote that the advantages of continuing the divided custody of Cameron outweighed the disadvantages because:

> "The child will have the experience of two separate homes. He is entitled to the love, advice and training of both his father and his mother. Associations, contact and friendly relations with both will protect his future welfare if one should die or become incapable of performing the obligations of a parent. It will give

recognition to the rights of parents who have performed their obligations as parents. *Mullen* v. *Mullen, supra. Andrews* v. *Geyer,* 200 Va. 107; 104 S. E. (2d) 747."

We find no error in the decree appealed from and it will, accordingly, be

*Affirmed.*