RUPERT C. PAYNE

V.

CARGEL E. SIMMONS, SR., ET AL.

Record No. 831245

November 26, 1986

Present: All the Justices

*Daniel M. O'Connell, Jr. (George M. Mayhugh; O'Connell & Mayhugh, P.C.,* on brief), for appellant.
*Robin C. Gulick (Gary M. Pearson; Bain, Trundle, Gulick and Carson,* on brief), for appellees.

RUSSELL, J., delivered the opinion of the Court.

This is a chancery suit by a seller of land for rescission of a deed. The seller contends that the deed was procured by fraud and that the consideration paid was so grossly inadequate as to shock the conscience of the court.

Rupert C. Payne received a deed from his parents in 1949 conveying to him a family farm containing approximately 50 acres and a home, located near Orlean, in Fauquier County. He had lived on the property since birth, except for a period of military service, and continued to reside there until September 13, 1971, when he conveyed it to his cousin, Chloe E. Simmons, and Cargel E. Simmons, Sr., her husband (collectively, the Simmons). Payne

understood that he had retained a life estate in the home, but the deed of September 13, 1971 contained no such provision. The Simmons evicted him from the property in April, 1972.

Payne brought this suit against the Simmons in 1977. He alleged that he "is an individual of subnormal intelligence and incapable of managing his everyday business affairs"; that the Simmons systematically importuned him to sell his farm and to that end gained his confidence and established a friendship with him; that they offered him $15,000 for a remainder interest, with Payne to retain a life estate in the property; that the Simmons took Payne to an attorney who prepared a deed which he signed; that the Simmons in fact paid him only $5,000 (although they falsely reported a consideration of $10,000 for tax purposes) and the deed contained no reservation of a life estate; that soon after delivery of the deed, the Simmons exercised great cruelty against him, threatening his life if he did not remove himself from the farm; and that he therefore left the premises. He asked for rescission and reconveyance of the land to him based upon his allegations of fraud, undue influence, and duress.

The court heard evidence *ore tenus* and issued a written opinion on October 28, 1982. Numerous witnesses testified to Payne's mental state. A psychiatrist testified that Payne had suffered for many years from organic neurological dysfunction and schizophrenia, conditions which impair "high-order thinking" and result in poor judgment, dependency, impulsiveness, uncertainty, and delusions. His opinion was that Payne had been functioning at a pre-adolescent mental level for the past 10 to 20 years. A clinical psychologist testified that Payne could be easily influenced and was incapable of exercising reasonable judgment with regard to value. Other witnesses testified that he seemed normal, had served in the armed forces, and had completed the 7th grade. The court concluded that although Payne's condition "may have made him a more likely target for the unscrupulous," he was nevertheless fully aware of what he was doing with respect to the sale in question.

The court also found from the evidence, however, that Payne had agreed to the conveyance only in consideration of the retention of a life tenancy in the home plus $5,000 in cash, and that without such a life tenancy, the $5,000 consideration would have been grossly inadequate. The court found that the parties had agreed that Payne would remain in his home until his death and

that the Simmons, who lived in Maryland, would only use Payne's land for the boarding and keeping of horses.

It is undisputed that the Simmons at first offered Payne $15,000 for the property, reserving to Payne a life tenancy in the home. The Simmons engaged E.L. Bain, a Warrenton attorney, to prepare a deed. There was no written contract between the parties, but Mr. Bain, in a November 1971 letter received in evidence, recalled that the parties appeared to have an oral agreement. Mr. Bain prepared a deed which reserved to Payne an express life estate in the home. Later, the Simmons told him to delete that provision, and he prepared a second draft which omitted it. The Simmons brought Payne into Mr. Bain's office on September 13, 1971 and Payne signed the second draft of the deed in their presence. The Simmons, with Payne, then went directly to the court house where the Simmons gave the deed to the clerk for recordation. The Simmons told the clerk that they had paid $10,000 for the property. After the deed had been recorded, Mrs. Simmons wrote out a check to Payne for $5,000. She added a notation: "Pd in full for farm" to the check. The court found that Payne had agreed to accept $5,000 in cash rather than the $15,000 originally agreed upon, but that he was unaware of the deletion of the life tenancy which he thought he would receive.

The court found that Payne had failed to prove actual or constructive fraud by clear and convincing evidence, but that he had proved such a "failure of consideration" as to warrant relief in that the Simmons had breached the terms of their agreement to provide him with a home. Because of lack of proof of fraud, the court denied Payne's prayer for rescission and cancellation of the deed.

Considering other forms of relief, the court noted that reformation of the deed was inappropriate because the Simmons had affirmatively instructed the draftsman to delete the provision for a life estate from the deed and that Payne had been unaware that the deed would contain such a provision. The court concluded that the proper remedy was compensation to Payne for his loss of use and occupancy of the property from the time of his eviction to the date of trial, and thereafter for the rest of his life. The court found that the value of the land and improvements, at the time of Payne's eviction in 1972, was $60,000, that the value of the home on the property was then $18,727, and that Payne's date of birth was January 6, 1908.

After making these findings, the court heard further evidence to determine the amount of compensation to which Payne was entitled for his loss of use and occupancy. This resulted in a money judgment in Payne's favor against the Simmons for $24,385.44, with interest and costs. Payne appeals, contending that the court erred in denying his prayer for rescission and cancellation. The Simmons assign no cross-error.

On appeal, Payne argues that the consideration he received was 8.3% of the value of the property according to unrefuted evidence. Acknowledging that mere inadequacy of price alone is not ordinarily ground for rescission, he argues that a shockingly low price, in connection with such other factors as mental incapacity, confidential or fiduciary relationships, undue influence, deceit or coercion, raise a logical inference of fraud. All those factors, he contends, were established by the evidence.

■ The chancellor's findings of fact, where supported by credible evidence, are conclusive on appeal. *Crounse* v. *Crounse*, 207 Va. 524, 529, 151 S.E.2d 412, 416 (1966). Accordingly, we are bound by the chancellor's determinations that Payne, at the time of the transaction, was not legally incompetent, but was of such diminished mental capacity as to make him "a more likely target for the unscrupulous." We are also bound by the chancellor's findings that the "primary consideration" for which Payne agreed to convey his farm was, in addition to $5,000 in cash, the reservation of a life tenancy in the home; that the provision for such a life tenancy was deleted from the deed at the Simmons' direction without Payne's knowledge or acquiescence; and that the Simmons evicted Payne from the property in violation of the agreement between the parties. We further accept the chancellor's finding that, without the promised life tenancy, the $5,000 consideration paid was "grossly disproportionate to the value of the property."*

---

* The only competent evidence of value was the opinion of an expert appraiser, who testified that the fair market value of the entire property was $60,000 on September 13, 1971, the date of the deed. The Simmons made no effort to refute this testimony, but offered, through the County Treasurer, a copy of a tax bill which showed a much lower assessed valuation for tax purposes. Both the treasurer and the appraiser testified, however, that the tax assessment had no meaningful relation to fair market value. The trial court found that the value of the property on April 21, 1972, when Payne was evicted, was $60,000. The Simmons argue on appeal that they made improvements during this seven-month interval which should be deducted from the value on the later date. If so, they introduced no evidence at trial of the value of any improvements made during that period,

■ When the foregoing findings of fact are applied, it becomes immediately apparent that Payne did not receive the equitable relief to which he was entitled. The only consideration he received was $5,000. Without the life tenancy agreed upon, $5,000 was a grossly inadequate price. Inadequate consideration, standing alone, would not dictate reversal; it does not, however, stand alone.

'In general, mere inadequacy of consideration uncombined with other circumstances does not afford sufficient ground for the rescission of a contract, or the cancellation of a written instrument. A contract will be set aside for inadequacy of consideration only when a consideration is so grossly inadequate as to shock the conscience and then a court of equity interferes because under such circumstances it constitutes satisfactory evidence of fraud or undue influence. But this does not mean that inadequacy of consideration is not an important factor in determining the validity of a contract. It, in connection with other factors, may well be evidence of fraud or undue influence. . . .

While a contract made by a person of fair understanding should not be set aside merely because it was a rash, improvident or hard bargain, yet if made with a person of impaired mind or feeble intelligence, the inference is that it was obtained by imposition, deception or undue influence, so as to cast upon the other party the burden of showing its fairness. And it is said that a comparatively slight degree of mental incapacity will justify a court in setting aside a contract for which no valuable consideration has been received. In these cases, also, it is not necessary that the inadequacy of consideration should be such as to "shock the conscience." *A court of equity will see to it that a bargain made with a person of weak intellect shall be fair.*'

*Long* v. *Harrison*, 134 Va. 424, 441-42, 114 S.E. 656, 661-662 (1922) (citations omitted) (emphasis added). Thus, although Payne was not found to be legally incompetent, his diminished

---

or any other factor which would have caused a change in value between the above dates. We conclude that the value of the property was $60,000 on September 13, 1971. The consideration paid by the Simmons was, therefore, 8.3% of fair market value, as Payne contends.

mental capacity, recognized by the chancellor's findings, in combination with the grossly inadequate consideration he received, entitled him to the remedy of rescission. *See Cook* v. *Hayden*, 183 Va. 203, 223, 31 S.E.2d 625, 633 (1944); *Bibby* v. *Thomas*, 165 Va. 248, 253, 182 S.E. 226, 229 (1935); *Fishburne and Wife* v. *Ferguson's Heirs*, 84 Va. 87, 110, 4 S.E. 575, 581 (1887). Payne asked for no relief other than rescission, and the chancellor erred in leaving the tainted transaction intact while attempting to redress the wrong by commuting the value of a life tenancy to its cash value and making an award of money damages.

■ Because the case must be remanded, it becomes necessary to decide more precisely the nature of the relief to which Payne is entitled. The chancellor concluded that neither actual nor constructive fraud had been established by the facts. On appeal, the conclusive effect of the trial court's findings of fact does not extend to its conclusions of law. We disagree with the chancellor's conclusion that the facts fall short of establishing fraud. Indeed, the combined factors of diminished mental capacity and grossly inadequate price, discussed above, in themselves warrant the inference of constructive fraud justifying rescission. The nature of the appropriate remedy turns on whether the transaction is found to be tainted by actual fraud as well.

■ In cases of this kind, where the transaction is avoided because of actual fraud, the grantee is not entitled to reimbursement for the purchase price, *Jackson* v. *Counts*, 106 Va. 7, 12, 54 S.E. 870, 872 (1906), or to compensation for improvements he has made, *Mosely* v. *Miller*, 76 Ky. (13 Bush) 408 (1877). Where the fraud justifying rescission is merely constructive, the grantee is entitled to be placed *in statu quo.*

The general doctrine seems well settled that where the grantee knows that the person with whom he is dealing is laboring under mental disability and overreaches him, he is not entitled to reimbursement or indemnity on account of the price paid. But the rule is otherwise where he deals fairly with the person under disability, without knowledge of his misfortune, in which case the purchaser must usually be placed *in statu quo.*

*Jackson* v. *Counts*, 106 Va. at 12, 54 S.E. at 872; *see also Upton* v. *Hall*, 225 Va. 168, 173, 300 S.E.2d 777, 779 (1983). We must

therefore consider the facts relating to the inception of the bargain to determine the category into which this transaction falls.

■ Applying the above rules to the facts in this case, we have no hesitancy in concluding that actual fraud was shown by clear and convincing evidence. Mrs. Simmons was Payne's first cousin and had known him all her life. He had worked for her father and she had lived "up the road" from him during her childhood. She was equally familiar with his property. Payne's mental condition had been constant over a period of many years, and she could not have been unaware of it.

Payne's version of the inception of the transaction differed markedly from the Simmons' version, and the chancellor made no specific finding in this regard, but it makes little difference which version is accepted. Payne said that the Simmons came to see him with a gift of clothing, that they returned on two further occasions and held barbecue picnics on his property, which they invited him to join, that they befriended him and told him that they would pay him $15,000 and give him a "lifetime home" on the property.

The Simmons' version was that they had offered Payne $15,000 and a life estate in the property, but decided to withdraw the offer because of a conversation with Payne's brother in Warrenton. They concluded that dissension in the family would result from the sale, and because they had no written contract with Payne they were free to withdraw their offer. When they went to Payne's farm to tell him they had decided not to buy, they found Payne walking along the road, highly agitated. He told them a man "up at the store" had threatened to shoot him that afternoon. They testified that Payne said "I want to get away from here; I want to go and live with my niece." At that point, they said, Payne offered to sell them the property for $5,000, and they agreed. Mr. Simmons testified: "He was running scared, as the old saying goes, and he wanted to get away from that place." Asked if it didn't seem odd that Payne would suddenly drop the price from $15,000 to $5,000, Simmons replied, "Well, at that time, as scared as Mr. Payne was, he would have probably almost given it to someone."

■ If Payne's version is accepted, the Simmons, aware of his mental condition, secured his agreement to sell for an inadequate price upon promise of a lifetime home which they had decided, before settlement, to deny him. If the Simmons' version is accepted, the Simmons, aware of Payne's mental condition, acquired his property for an inadequate price by taking advantage of his

fear. Either version involves such overreaching, when dealing with a person of known diminished mental capacity, as to constitute actual fraud. It follows that the Simmons will not be entitled, upon rescission, to reimbursement for the purchase price or to compensation for improvements.

We will reverse the decree appealed from and remand the cause for the entry of a decree of rescission and cancellation, and for such further proceedings, consistent with this opinion, as may be appropriate.

*Reversed and remanded.*

COMPTON, J., dissenting.

In a recent decision, we reiterated the basic rule of appellate procedure applicable to cases like this in which the trial court has heard testimonial evidence and made findings upon disputed facts. In *Rochelle* v. *Rochelle*, 225 Va. 387, 302 S.E.2d 59 (1983), we said

> "The record shows that the chancellor gave the evidence . . . and arguments full and patient consideration. In these circumstances, we cannot substitute our conclusions for those drawn from the evidence by the trier of fact. A chancellor's finding on conflicting evidence, heard *ore tenus*, will not be disturbed on appeal unless it is plainly wrong or without evidence to support it." 225 Va. at 393, 302 S.E.2d at 63.

The majority in the present case, while saluting the foregoing principle, disregards it. Indeed, the Court actually redetermines the facts on appeal in the process of concluding that actual fraud was committed.

A review of this record convinces me that the trial court thoroughly considered the evidence, drew proper inferences from the facts, and reached proper conclusions supported by that evidence. In a five-page written opinion, the chancellor carefully articulated his findings.

In my view, there is credible evidence to support the chancellor's judgment which was based, in part, on his observation of the witnesses as they testified, an advantage no member of this Court enjoyed. Consequently, I would affirm the decision below, not because I would have come to the same conclusion as the trial judge had I been presiding at trial. Rather, I would affirm because I feel bound by the salutary rule quoted above.