ROBERT GREENSPAN, M.D., ET AL.

V.

RAPHAEL J. OSHEROFF, M.D., ET AL.

Record No. 831646

November 26, 1986

Present: All the Justices

*Robert P. Trout (Frances L. Wetzel; Dunnels, Duvall, Bennett & Porter, on briefs), for appellants.*

*David J. Fudala (Philip J. Hirschkop; John D. Grad; Hirschkop & Grad, on brief), for appellees.*

RUSSELL, J., delivered the opinion of the Court.

The dispositive question in this appeal is whether the evidence was sufficient to support the trial court's finding of a violation of Code §§ 18.2-499 with imposition of damages pursuant to 18.2-500,[1] justifying an award of treble damages and counsel fees for an attempt, by malicious conspiracy, to injure another in his profession. We conclude that there is ample support in the record for the finding.

The facts will be stated in the light most favorable to the plaintiff, who prevailed below. Dr. Raphael Osheroff was a physician,

---

[1] 18.2-499.— (a) Any two or more persons who shall combine, associate, agree, mutually undertake or concert together for the purpose of willfully and maliciously injuring another in his reputation, trade, business or profession by any means whatever, or for the purpose of willfully and maliciously compelling another to do or perform any act against his will, or preventing or hindering another from doing or performing any lawful act, shall be jointly and severally guilty of a Class 3 misdemeanor. Such punishment shall be in addition to any civil relief recoverable under § 18.2-500.

(b) Any person who attempts to procure the participation, cooperation, agreement or other assistance of any one or more persons to enter into any combination, association, agreement, mutual understanding or concert prohibited in subsection (a) of this section shall be guilty of a violation of this section and subject to the same penalties set out in subsection (a) hereof.

(c) This section shall not affect the right of employees lawfully to organize and bargain concerning wages and conditions of employment, and take other steps to protect their rights as provided under State and federal laws.

18.2-500. — (a) Any person who shall be injured in his reputation, trade, business or profession by reason of a violation of § 18.2-499, may sue therefor and recover three-fold the damages by him sustained, and the costs of suit, including a reasonable fee to plaintiff's counsel; and without limiting the generality of the term, "damages" shall include loss of profits. Such counsel shall in no case receive any other, further or additional compensation except that allowed by the court and any contract to the contrary shall be null and void.

(b) Whenever a person shall duly file a bill in chancery in the circuit court of any county or city against any person alleging violations of the provisions of § 18.2-499 and praying that such party defendant be restrained and enjoined from continuing the acts complained of, such court shall have jurisdiction to hear and determine the issues involved, to issue injunctions pendente lite and permanent injunctions and to decree damages and costs of suit, including reasonable counsel fees to complainants' and defendants' counsel.

board-certified in the specialty of nephrology, an area of medicine encompassing treatment of kidney disease and renal disorders. He established his practice in Alexandria in 1972 and became very successful. As a major part of his practice, he operated a dialysis center where patients having chronic kidney disease were admitted for periodic filtering of the blood — an essential process for the survival of such patients. By 1977, Dr. Osheroff was owner and operator of the Northern Virginia Dialysis Center (NVDC) in Alexandria, which had about 85 continuing patients, and another dialysis center in Fredericksburg. He had also obtained from the State Health Commissioner a "certificate of need" granting him permission to open a third such center in Warrenton.

In 1977, Dr. Osheroff entered into a contract with National Medical Care, Inc. (NMC), a corporation which operates many dialysis centers throughout the United States. Pursuant to this agreement, NMC purchased NVDC, the Fredericksburg center and the Warrenton certificate of need from Dr. Osheroff. Dr. Osheroff was employed as medical director of these facilities and received 40% of the net income therefrom, after taxes, as his compensation. He retained the exclusive right to fees for professional services rendered to patients in the centers and had the sole right to choose other physicians who could practice in them. He also carried on his own private office practice and did consulting work in Northern Virginia hospitals. By 1978, his net income from these sources exceeded $300,000 per year. He incorporated his practice as Raphael J. Osheroff, M.D., Inc. (Osheroff, Inc.).

In June 1978, Osheroff, Inc., hired Dr. Robert Greenspan, who had just finished his residency in nephrology, at a starting salary of $45,000 per year, with a promise of a partnership in two years. Soon thereafter, the corporation hired Dr. Stephen Tolkan at a salary of $40,000 per year, but without a promise of partnership. Both were to assist Dr. Osheroff in his practice.

In the summer and fall of 1978, Dr. Osheroff suffered increasingly severe mental depression. He continued to see patients, but consulted psychiatrists and did less and less work. Dr. Greenspan urged Dr. Osheroff to seek hospitalization and stated that he would take care of the practice in Dr. Osheroff's absence. He became Dr. Osheroff's closest personal confidant during this period. He threatened to leave if Dr. Osheroff did not enter a hospital.

On January 2, 1979, Dr. Greenspan drove Dr. Osheroff to a private psychiatric facility in Rockville, Maryland, where Dr.

Osheroff voluntarily committed himself for treatment. During the drive, Dr. Greenspan repeated his assurances that he would take care of the practice during Dr. Osheroff's absence. A few days later, Dr. Greenspan met with Dr. Osheroff's attorney at NVDC and stated that he would handle all medical decisions and that he would act as "trustee and fiduciary" for Dr. Osheroff.

During the first part of his hospitalization, Dr. Osheroff made frequent telephone calls to NVDC, but at Dr. Greenspan's request, the hospital staff caused his telephone privileges to be curtailed to one call per week, on Sunday evenings, when Dr. Greenspan would place a call to the hospital. Dr. Greenspan was the only person at NVDC with whom Dr. Osheroff had any communication.

During the first months of 1979, Dr. Greenspan began to ask the accountant who was handling Dr. Osheroff's financial affairs for the figures that would apply to a sale of the practice. Dr. Osheroff, during his weekly calls from Dr. Greenspan, asked for Dr. Greenspan's help in getting out of the hospital. Dr. Greenspan assured him that he was being well cared for and that he would continue to take care of Dr. Osheroff's interests.

After Dr. Osheroff entered the hospital, Dr. Greenspan instructed the staff at NVDC to designate for his personal attention all referrals and new patients in the Alexandria area, and to refer to Dr. Tolkan all patients in the outlying hospitals. Dr. Greenspan raised his own salary to $100,000, raised Dr. Tolkan's to $60,000, and employed Peggy Hess, a friend of Dr. Greenspan's wife, as head nurse at NVDC. He did not disclose these changes to Dr. Osheroff.

In March 1979, Dr. Greenspan prepared a letter, for signature by Dr. Osheroff, stating that Dr. Greenspan was formally "associated" in the practice of medicine with Dr. Osheroff. Dr. Greenspan took the letter to the hospital and obtained Dr. Osheroff's signature. The significance of this designation was that, under the terms of Dr. Osheroff's contract with NMC, it qualified Dr. Greenspan for the right of first refusal to purchase the practice and to renegotiate with NMC for the exclusive right to provide medical services at the dialysis centers, in the event Dr. Osheroff was disabled and unable to return to practice. Dr. Constantine Hampers, Chairman of the board of NMC, formally appointed Dr. Greenspan Acting Medical Director of the dialysis centers soon thereafter. After obtaining Dr. Osheroff's signature on the

letter, Dr. Greenspan made no further visits to him in the hospital.

Dr. Greenspan saw a need for a new dialysis center near Woodbridge, in Prince William County. This area lay within a 75-mile radius of the existing NMC centers and was therefore covered by a non-competition clause in Dr. Osheroff's contract with NMC. In addition, another NMC affiliate had a right of first refusal to open a Prince William facility, but had not exercised it. The trial court found that if Dr. Osheroff had requested waivers of these rights, he could have obtained them.

In September 1979, Dr. Greenspan applied for a certificate of need for a Woodbridge center. The application was written on NVDC stationery which carried Dr. Osheroff's name, but was signed by Dr. Greenspan. Dr. Greenspan told Dr. Osheroff's attorney that the application was being made for Dr. Osheroff's benefit and that he would hold the certificate for Dr. Osheroff. He also stated, untruthfully, that he had obtained waivers of NMC's rights from Dr. Hampers. Dr. Greenspan gave all persons acting for Dr. Osheroff the impression that the Woodbridge facility would either be Dr. Osheroff's, or operated jointly by Drs. Osheroff and Greenspan. On January 8, 1980, the State Health Commissioner granted a certificate of need to Prince William Dialysis Facility, Inc., a corporation entirely owned by Dr. Greenspan, for the operation of a dialysis center at Woodbridge. Dr. Osheroff was unaware of these developments.

Dr. Osheroff's condition deteriorated at the hospital in Maryland, and he was transferred to a hospital in Connecticut where he was, for the first time, treated with medication. He improved rapidly under the treatment, and was discharged from the hospital, with follow-up care to be given by a Washington psychiatrist, on November 1, 1979.

During Dr. Osheroff's absence, his attorney had discussed with Dr. Greenspan a future partnership arrangement between the two physicians. Dr. Greenspan refused to discuss a partnership, but repeated his desire to buy the practice. After Dr. Osheroff returned, he told Dr. Greenspan that he was feeling well and that he wished to return to practice. Dr. Greenspan replied, untruthfully, that Dr. Hampers wished Dr. Osheroff to sell the practice to Dr. Greenspan.

In late 1979, Dr. Osheroff returned to NVDC and made the rounds of patients under treatment. A staff meeting followed in

which Nurse Hess suggested that the staff sign a petition to NMC stating their refusal to work for Dr. Osheroff. Such a petition was prepared and circulated on December 12, 1979.

In November 1979, Dr. Greenspan met with Dr. Hampers at National Airport. Dr. Hampers told Dr. Greenspan that he wanted him to enter into a contract with NMC for the operation of the Woodbridge facility. Dr. Hampers had also learned that Dr. Greenspan had made application in his own name for the right to open a new facility in northeast Washington, which would be further competition for NMC. Dr. Greenspan told Dr. Hampers that he would consider turning the Washington and Woodbridge facilities over to NMC if Dr. Osheroff were ousted and he, Greenspan, were made the permanent medical director of the NMC facilities in Virginia. Dr. Hampers stated that he would not enter into collusion to force Dr. Osheroff to sell. Dr. Greenspan replied that if Dr. Osheroff refused to sell the practice to him, it would make little difference because Dr. Greenspan was going to take over all the patients in any event. A few days later, Dr. Greenspan applied for the right to open an additional competing facility in Montgomery County, Maryland.

On November 30, 1979, after Drs. Greenspan and Tolkan had barred him from making rounds at NVDC, Dr. Osheroff travelled to Boston, Massachusetts, to confer with Dr. Hampers. He learned for the first time of Dr. Greenspan's activities in setting up competing dialysis facilities and his efforts to have Dr. Osheroff removed as medical director. Dr. Hampers agreed that Dr. Greenspan should be discharged and, after satisfying himself that Dr. Osheroff was competent to resume practice, wrote a letter reinstating Dr. Osheroff as medical director of NMC's dialysis centers in northern Virginia.

On December 12, 1979, Dr. Osheroff and his attorney had a long meeting with Dr. Greenspan, in which Dr. Osheroff offered Dr. Greenspan a partnership. Dr. Greenspan refused, and was then told that his employment was terminated. Dr. Greenspan responded angrily that he had already made a telephone call which would insure that Dr. Osheroff would never practice medicine in the area again. He told Dr. Osheroff that he would lose everything he had unless he sold his practice to Dr. Greenspan.

Dr. Greenspan's mention of a telephone call referred to a call he had made earlier that day to the Chief of the Department of Medicine at Alexandria Hospital concerning Dr. Osheroff. As a

result of that call, Dr. Osheroff's hospital privileges were summarily suspended. The suspension was confirmed by letter the following day, but Dr. Osheroff's privileges were reinstated on January 15, 1980, after the hospital's executive committee had held a hearing and considered an evaluation by an independent psychiatrist. Dr. Greenspan attended the hearing and testified that, in his opinion, Dr. Osheroff was not competent to practice medicine.

After Dr. Greenspan had been terminated at NVDC, he rented independent office space on the first floor of the building in which NVDC was located. Several NVDC employees, including Dr. Tolkan, resigned and joined him in practice there. Drs. Greenspan and Tolkan, notwithstanding the termination of their employment, continued to make rounds of patients at NVDC for about two weeks, until they were threatened with arrest for trespass. During this period, Dr. Greenspan composed a form, typed by one of his employees on NVDC stationery which he had obtained, as follows:

TO WHOM IT MAY CONCERN:

I, _____, currently a patient undergoing chronic hemodialysis at the Northern Virginia Dialysis Center, do hereby declare that I will not accept any medical services from Raphael J. Osheroff, M.D. and am under the care of Robert E. Greenspan, M.D. for any and all medical services associated with my therapy at the Northern Virginia Dialysis Center in Alexandria, Virginia.

_____
Signature of Patient

_____
Date Signed

_____
Signature of Witness

The patients came into the center at various hours, requiring the employees to work in eight-hour shifts. Dr. Greenspan attended all shifts until he had contacted each patient, giving some of them the form to sign while they were actually undergoing dialysis. He told them that they should sign it if they wished him to continue to treat them. Nurse Hess, although still an employee of Osheroff, Inc., witnessed the forms and in one case provided a form to a patient.

Drs. Greenspan and Tolkan filed suit in the United States District Court for the Eastern District of Virginia seeking an injunction and treble damages against Dr. Osheroff and Osheroff, Inc. and alleging tort claims and antitrust violations. After an expedited hearing, the federal court denied their claims and ruled that Dr. Osheroff had ample cause to discharge Dr. Greenspan summarily and that the patients were Dr. Osheroff's, not Dr. Greenspan's or Dr. Tolkan's.

When Dr. Greenspan's Prince William Dialysis Center opened in June 1980, approximately 30 chronic hemodialysis patients of NVDC transferred to it. During the spring of that year, Nurse Hess and two other nurses left NVDC and went to work for Dr. Greenspan.

Dr. Osheroff and Osheroff, Inc. brought this suit in equity against Dr. Greenspan, Dr. Tolkan, Nurse Hess, and Prince William Dialysis Facility, Inc. Counts I and II alleged that the defendants had willfully and maliciously undertaken to injure the complainants in their reputation, trade, business or profession in violation of Code §§ 18.2-499 and 18.2-500. Count III alleged defamation. Count IV alleged malicious interference with the contractual relations existing between the complainants and NMC. Count V sought the imposition of a constructive trust upon the profits of Prince William Dialysis Facility, Inc. Count VI alleged common-law interference with business, reputation and both existing and prospective physician-patient relationships. The bill prayed for treble damages, injunctive relief, attorneys fees, and the constructive trust mentioned above.

The court heard evidence *ore tenus* during 13 trial days, which extended over a period of several months. The record is, of course, voluminous. The chancellor issued a memorandum opinion, 30 pages in length, containing detailed findings of fact and conclusions of law.

Under Counts I and II, the chancellor found that neither Dr. Tolkan nor Nurse Hess had entered into a malicious conspiracy to injure Dr. Osheroff, and that they were therefore not liable for treble damages under Code §§ 18.2-499 and 18.2-500. Dr. Greenspan, on the other hand, was found to have been motivated by a malicious desire to harm Dr. Osheroff and his professional corporation in their business or profession. Because he did not conspire or combine with any other person to accomplish this end, the court found no violation of Code § 18.2-499(a). The court did, however, find Dr. Greenspan guilty of attempting to procure

others to participate in a conspiracy prohibited by Code § 18.2-499(a), and therefore concluded that Dr. Greenspan was in violation of Code § 18.2-499(b), which prohibits such attempts. Assessing damages pursuant to Code § 18.2-500, the court awarded compensatory damages of $184,804, trebled to $554,412, plus $90,000 in attorneys fees and costs against Dr. Greenspan. No error has been assigned to the quantum of attorneys fees, but Dr. Greenspan challenges the entire award under Counts I and II on appeal.

Under Count III, the court found no malice on Dr. Tolkan's part, but found that Nurse Hess had uttered an unprivileged and defamatory statement to a newspaper and assessed $5,000 damages against her. That award is not before us on appeal. The court awarded $10,000 in compensatory damages and $20,000 in punitive damages against Dr. Greenspan in favor of Dr. Osheroff for defamation, but provided that those damages would not be in addition to the damages assessed under Counts I, II, and VI.

Under Count IV, the court found for the defendants. Under Count V, the court imposed a constructive trust in favor of both complainants on one-half of the profits to be derived from the Prince William Dialysis Facility until the judgment under Counts I and II is paid in full. Under Count VI, the court awarded the complainants compensatory damages of $184,804 and punitive damages of $369,608 against Dr. Greenspan, but provided that these would not be in addition to the damages awarded under Counts I, II, and III.

On appeal, Dr. Greenspan contends that the chancellor erred in his findings under Counts I and II because, (1) the evidence was insufficient to support a finding of actual malice, because (2) even if malice is found, the evidence shows that Dr. Greenspan was also motivated in part by the legitimate purposes of caring for his patients and promoting his own practice, and because (3) the award of damages was excessive.

■ As stated at the outset, our review of the record reveals ample support for the chancellor's finding of actual malice. The evidence was lengthy and conflicting and might have given rise to inferences and conclusions other than those which were reached. But we do not have the benefit of direct observation of the witnesses and we lack the chancellor's opportunity to weigh their testimony first hand. Accordingly, we will not substitute our judgment for his as to the controlling inference to be drawn from the

conflicting evidence adduced in his presence. *Crounse* v. *Crounse*, 207 Va. 524, 529, 151 S.E.2d 412, 416 (1966); *Hastings* v. *Taylor*, 185 Va. 13, 14, 37 S.E.2d 767, 767 (1946).

Dr. Greenspan argues, however, that even if the finding of malice is accepted, he should not be found guilty under a criminal statute providing severe civil penalties when his motives were found to be mixed. He bases this argument upon a portion of the chancellor's opinion:

I read the statute to mean that Dr. Greenspan must have been motivated by a malicious desire to harm Dr. Osheroff and his professional corporation in their business or profession in order to have violated either subparagraph (a) or (b) of Code § 18.2-499. As in the case of Dr. Tolkan, I am satisfied that Dr. Greenspan intended to foster his own practice and render proper medical care to his patients, both of which are legitimate purposes; however, his conduct was so unprincipled and overreaching as to convince me that he did in fact act willfully and maliciously for the specific purpose of harming Dr. Osheroff and his professional corporation in their business or profession.

Dr. Greenspan contends that because Code § 18.2-499 is a criminal statute, it should be strictly and narrowly construed. Specifically, he argues, the presence of benign motives, found by the court to coexist with his malicious motive, should constitute a defense. We do not agree. The chancellor's conclusion that Dr. Greenspan's primary motivation was malicious is sufficient. In criminal cases requiring proof of specific intent, it is no defense that the accused was motivated in part by a desire to advance his own interests or even to help others, if the requisite intent to harm the victim be proved. "Noble motives and pure thoughts cannot bar the conviction of one who admits intentional action which violates the proscriptions of a statute declaring that action criminal . . . ." *United States* v. *Ragsdale*, 438 F.2d 21, 26 (5th Cir.), cert. denied, 403 U.S. 919 (1971). Further, in this case the benign motives were not directed toward the victims, so as to ameliorate the malice directed toward them. Dr. Greenspan's intent was to benefit himself and his patients, not Dr. Osheroff.

We hold, therefore, that when the fact-finder is satisfied from the evidence that the defendant's primary and overriding

purpose is to injure his victim in his reputation, trade, business or profession, motivated by hatred, spite, or ill-will, the element of malice required by Code § 18.2-499 is established, notwithstanding any additional motives entertained by the defendant to benefit himself or persons other than the victim. Therefore, the court correctly found that Dr. Greenspan had violated Code § 18.2-499(b) and that he was subject to the penalties provided by Code § 18.2-500.

■ We find no error in the chancellor's assessment of damages under Code § 18.2-500. Dr. Osheroff introduced the testimony of an expert economist who calculated the income loss sustained as a result of the opening of the Prince William Dialysis Center and the patients taken by Drs. Greenspan and Tolkan. For the years 1980 through 1985, this amounted to $824,662.00, discounted to a present value of $535,270. The chancellor disagreed with the economist's projection of these losses over a six-year period, and concluded, based upon the historic growth of the practice, that Dr. Osheroff could fairly be expected to rebuild his practice in three years. A three-year projection, discounted to present value, produced the court's assessment of actual damages of $184,804. We find nothing unreasonable in this approach. As the chancellor noted, the award is roughly equivalent to the loss of professional fees for the thirty patients actually lost during the first year, for twenty such patients the second year, for ten the third year, and none thereafter. That rate of growth is reasonably related to the history of the practice as shown by the evidence.

■ Because the awards of damages made under Counts III and VI are included within, and are not in addition to, the award of treble damages made under Counts I and II, our affirmance of the latter renders moot any further consideration of the arguments on appeal relating to defamation and tortious interference with contractual relationships. It is necessary to consider the propriety of the constructive trust imposed on one-half the profits of the Prince William Dialysis Center under Count V, however, because the appeal bond may be insufficient to satisfy the judgment in full and the constructive trust may come into play in order to satisfy the judgment for damages.

The chancellor found that Dr. Osheroff could have obtained the necessary waivers in order to establish a dialysis facility in Prince William County with the consent of NMC. It clearly would have been in his interest to do so. There was no direct evidence on this

point, but the chancellor's finding is based upon an inference warranted by the circumstantial evidence concerning Dr. Osheroff's relationship with NMC and the success of his practice. The chancellor further found that Dr. Greenspan had a fiduciary obligation to Dr. Osheroff and his professional corporation arising out of the employer-employee relationship between them as well as Dr. Greenspan's explicit assumption of a duty to take care of Dr. Osheroff's practice during his illness. The chancellor concluded that, in establishing the Prince William Dialysis Center in competition with Dr. Osheroff's practice, after applying for a certificate of need on Dr. Osheroff's stationery and purportedly for Dr. Osheroff's benefit, Dr. Greenspan had breached his fiduciary duty to exercise the utmost faith and loyalty to his employer. Because Dr. Greenspan stood to profit from that breach, the chancellor found, by clear and convincing evidence, that the imposition of a constructive trust was warranted upon the profits of the instrumentality which was the product of Dr. Greenspan's breach of fiduciary duty. The chancellor took the view that if Dr. Greenspan had in fact established the Prince William facility in compliance with his fiduciary duty, he and Dr. Osheroff would have operated it as equal partners. The constructive trust was, therefore, imposed only on that half of the profits which would rightfully have accrued to Dr. Osheroff.

A constructive trust is created by operation of law and is independent of the intention of the parties. It may arise from breach of a fiduciary duty as well as from actual fraud or unconscionable conduct amounting to constructive fraud. *Leonard* v. *Counts*, 221 Va. 582, 588-90, 272 S.E.2d 190, 195-196 (1980); *Porter* v. *Shaffer*, 147 Va. 921, 928-29, 133 S.E. 614, 616 (1926). The evidence necessary to support the imposition of a constructive trust must be clear, definite, and convincing. *Sutton* v. *Sutton*, 194 Va. 179, 185, 72 S.E.2d 275, 278 (1952).

In *Horne* v. *Holley*, 167 Va. 234, 240, 188 S.E. 169, 172 (1936), we said:

It is well settled that where one person sustains a fiduciary relation to another he can not acquire an interest in the subject matter of the relationship adverse to such other party. If he does so equity will regard him as a constructive trustee and compel him to convey to his associate a proper interest

in the property or to account to him for the profits derived therefrom. (Citations omitted).

Applying the foregoing principles to the facts before us, we find the chancellor's imposition of a constructive trust in favor of the complainants upon one half the profits of the Prince William Dialysis Center, until the judgment is paid in full, to be proper.

Because we find no error in the decree appealed from, it will be

*Affirmed.*