**MULTI-CHANNEL TV CABLE COMPANY, d/b/a Adelphia Cable Communications, Plaintiff-Appellee,**

v.

**CHARLOTTESVILLE QUALITY CABLE OPERATING COMPANY, a Virginia corporation; Rivanna Partnership, a Virginia general partnership; Alcova Realty & Management Company; Fountain Court Limited Partnership, a Virginia limited partnership; John A. Schwab, Jr.; Bernard A. Schwab; C. Stuart Raynor, Jr., Defendants-Appellants.**

No. 95–3021.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 30, 1997.

Decided March 17, 1997.

**ARGUED:** Deborah Colleen Costlow, Winston & Strawn, Washington, DC, for Appellants. John Douglas McKay, Barrick & McKay, P.L.C., Charlottesville, VA, for Appellee. **ON BRIEF:** Alan G. Fishel, Winston & Strawn, Washington, DC; Frederick T. Heblich, Jr., Parker, McElwain & Jacobs, Charlottesville, VA, for Appellants. David C. Wagoner, Barrick & McKay, P.L.C., Charlottesville, VA; Randall D. Fisher, John B. Glicksman, Adelphia Cable Communications, Coudersport, PA, for Appellee.

Before WILKINSON, Chief Judge, and HAMILTON and MICHAEL, Circuit Judges.

Affirmed in part and vacated in part by published opinion. Judge HAMILTON wrote the opinion, in which Chief Judge WILKINSON and Judge MICHAEL joined.

## OPINION

HAMILTON, Circuit Judge.

This appeal represents the latest in a series to come before the court stemming from a dispute over cable franchise rights in Charlottesville, Virginia. In this appeal, defendant/appellant, Charlottesville Quality Cable (CQC), contests the magistrate judge's determination, following a bench trial, that it was civilly liable for statutory conspiracy, *see* Va. Code Ann. § 18.2–499(B) (Michie 1994). CQC also challenges various aspects of the damages awarded to plaintiff/appellee, Multi-Channel TV d/b/a Adelphia (Adelphia). We affirm the magistrate judge's decision holding CQC liable for statutory conspiracy and affirm the magistrate judge's award of damages to Adelphia, except the punitive damages award, which we vacate.

I.

Adelphia and CQC are competing cable television providers for the Charlottesville, Virginia area. In 1981, Adelphia began installing, and maintaining at its own expense, cable distribution systems in multi-dwelling units (MDUs) in Charlottesville at the request of the MDU owners. These cable distribution systems, known as "home run systems," gave Adelphia the ability to provide a-la-carte cable television to the MDU tenants on a personalized basis. The home run systems replaced the previous "bulk service" systems through which the MDU owners subscribed to Adelphia's cable television services in bulk, paid Adelphia one monthly fee, and provided cable television as part of its lease obligations to the MDU tenants.

In November 1993, Alcova, the property manager for certain MDUs, executed an exclusive cable television provider agreement with CQC. That agreement gave CQC the exclusive right to provide cable television services to the tenants within the MDUs managed by Alcova. The agreement also gave CQC permission to install its own wiring equipment in the MDUs. In order to obtain that exclusive access, CQC entered into a kick-back arrangement with Alcova. Pursuant to the kick-back arrangement, Alcova received a "consultant fee" amounting to twelve percent of CQC's revenues from providing cable television service to the tenants in the MDUs Alcova managed.

After the grant of exclusive access to the MDUs by Alcova, CQC began installing its own system at the MDUs. CQC's cable distribution system uses a microwave transmitter to carry its signal from a central locale to its subscribers, who receive the signal via special microwave antennas. Providing cable television service to the MDU tenants under CQC's system requires both a central microwave antenna at each MDU and a distribution system, such as the one already installed

by Adelphia, to carry the signal from the central antenna to each tenant subscriber. Consequently, to install its own distribution system, CQC erected microwave antennas at each MDU, cut Adelphia's cable television signal carrying wires, and then attached its microwave antennas to the distribution system already installed and maintained by Adelphia.

CQC's actions abruptly terminated Adelphia's service to its tenant subscribers without Adelphia's or the tenants' prior consent. Indeed, Adelphia was not even given notice that its service to its tenant clients would be terminated. Adelphia only discovered that its distribution system had been tampered with and its wires cut when Adelphia employees performed a routine inspection of the Adelphia home run systems at the MDUs.

On December 3, 1993, Adelphia filed suit in the United States District Court for the Western District of Virginia. Adelphia's complaint named CQC, Alcova, and various MDU owners as defendants and alleged numerous claims, including: interference with an easement; tortious interference with Adelphia's contractual relationships; breach of license; conversion; Virginia common law and statutory conspiracy, Va.Code Ann. § 18.2–499; and violations of Virginia's Residential Landlord Tenant Act (Landlord Tenant Act), Va.Code Ann. §§ 55–248.2 to 55–248.52 (Michie 1974).

Adelphia also filed a motion requesting a preliminary injunction on December 3, 1993, to prohibit the named defendants from operating under the kick-back agreement and to allow Adelphia to continue providing cable television service to the MDU tenants pending the outcome of the litigation. The magistrate judge entered a preliminary injunction on December 16, 1993, which: (1) prohibited CQC and the MDU owners from operating under the kick-back agreement; (2) prohibited the MDU owners and Alcova from expressing to the tenants any preference for cable providers; (3) permitted Adelphia to reconnect cable services to those tenants whose leases had not yet expired and who expressed a preference for Adelphia's cable service over CQC's; (4) enjoined CQC from utilizing any Adelphia equipment in provid-

ing of its cable service to those tenants who did not reconnect to Adelphia's system; and (5) allowed Alcova to enter into new or renewal leases which contained language that indicated that it was the landlord's exclusive right to choose a cable television provider for the MDU tenants. We affirmed the magistrate judge's grant of the preliminary injunction on April 14, 1994, except that portion of the injunction which prohibited the MDU owners and Alcova from expressing a preference for cable providers to the MDU tenants. *See Multi–Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.,* 22 F.3d 546 (4th Cir.1994) (hereinafter, *CQC I* ).

Adelphia then moved for a modification of the preliminary injunction. The magistrate judge declined to modify the preliminary injunction and Adelphia appealed. Again, we affirmed. *See Multi–Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.,* No. 94–2569, 1995 WL 406612 (4th Cir. July 11, 1995) (unpublished) (hereinafter, *CQC II* ).

In February 1995, the magistrate judge granted Adelphia's motion for summary judgment on its claims of breach of license, tortious interference with contractual relations, violations of the Landlord Tenant Act, and a portion of its conversion claims. The magistrate judge then decided a related case in which Adelphia sued CQC and a different group of MDU owners. In that case, the magistrate judge found for Adelphia on conversion, tortious interference, and Landlord Tenant Act claims and awarded Adelphia $68,000 in damages for the conversion of its cable wires, and $219,887 for both the tortious interference with its prospective contractual relationships and for violations of the Landlord Tenant Act. In addition, the magistrate judge enjoined any continued use of the kick-back agreement and vacated CQC's right of exclusive access to the Alcova-run properties which it gained as a result of that agreement. On September 18, 1995, we affirmed. *See Multi–Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.* 65 F.3d 1113 (4th Cir.1995) (hereinafter, *CQC III* ).

This suit then proceeded to trial on Adelphia's claims of conversion, statutory conspira-

cy, and common law conspiracy. After a bench trial, the magistrate judge: (1) held that CQC was liable under Virginia's statutory conspiracy statute, § 18.2–499(B), for maliciously attempting to conspire with the MDU owners and Alcova to eliminate Adelphia from the Charlottesville cable market; (2) held Alcova and the MDU owners liable for common law conspiracy (*i.e.*, the magistrate judge did not find that those defendants acted with the requisite legal malice to support a statutory conspiracy violation); (3) awarded Adelphia $8,200 in conversion damages and $143,300 in lost profits against all the defendants; (4) trebled the damages against CQC because of its statutory conspiracy liability; (5) awarded Adelphia $10,000 in punitive damages against CQC; and (6) voided the kickback and exclusive provider agreement between CQC and Alcova in addition to enjoining the defendants from negotiating any like agreement in the future. CQC appeals.

### II.

CQC's first four arguments pertain to the magistrate judge's conclusion that CQC violated Virginia's civil statutory conspiracy law, *see* Va.Code Ann. § 18.2–499(B). None of these arguments has merit.

■■■ Under Virginia law, any person who attempts to procure the participation of others in an attempt to wilfully and maliciously injure another in his reputation, trade, business, or profession can be liable for statutory conspiracy. *See* Va.Code Ann. § 18.2–499.[1] A plaintiff proceeding under this statute must prove its case by clear and convincing evidence. *See* Va.Code Ann. § 18.2–500; *Tazewell Oil Co., Inc. v. United Va. Bank*, 243 Va. 94, 413 S.E.2d 611, 619

(1992). Accordingly, CQC was liable for statutory conspiracy if clear and convincing evidence showed that: (1) CQC attempted to conspire with one or more of the other defendants to harm Adelphia; (2) CQC acted with legal malice towards Adelphia; and (3) the conspiratorial actions of CQC and one or more of the other defendants caused Adelphia to suffer damages. *See Commercial Bus. Sys. v. BellSouth Servs., Inc.*, 249 Va. 39, 453 S.E.2d 261, 266–67 (1995) (hereinafter *CBS* ); *Allen Realty Corp. v. Holbert*, 227 Va. 441, 318 S.E.2d 592, 596 (1984).[2]

■■■ First, CQC argues that it did not possess the requisite malice to justify a finding of civil liability pursuant to § 18.2–499(B). As CQC's argument goes, § 18.2–499(B) requires proof not only that CQC specifically intended to directly harm Adelphia in its trade and business, but also that CQC did so without any intent to benefit itself.

CQC's argument was rejected by the Virginia Supreme Court in *Greenspan v. Osheroff*, 232 Va. 388, 351 S.E.2d 28 (1986). In that case, the court affirmed the trial court's holding that the defendant was liable for statutory conspiracy in the face of a claim that the defendant had legitimate and legal motives for his actions. *Id.* at 35. In reaching its decision, the Virginia Supreme Court noted that "when the fact-finder is satisfied ... that the defendant's primary and overriding purpose is to injure his victim ... [and that purpose is] motivated by ... ill-will, the element of malice ... is established, notwithstanding any additional motives entertained by the defendant to benefit himself." *Id.* at 35–36.

---

**1.** Virginia's statutory conspiracy statutes essentially accomplish two purposes—the imposition of both criminal penalties and civil liability for the same actions. Section 18.2–499(A) of the Virginia Code sets forth the requirements for proving a criminal statutory business conspiracy, a Class 1 misdemeanor in Virginia, and provides that criminal punishment "shall be in addition to any civil relief recoverable under § 18.2–500." Subsection (B) to § 18.2–499 sets forth civil and criminal liability for any person who attempts to procure the participation of others in a conspiracy and imposes the same criminal and civil pen-

alties as set forth in § 18.2–499(A). We deal herein only with CQC's civil liability for attempting to procure the participation of the other defendants in a conspiracy, pursuant to § 18.2–499(B).

**2.** According to the dictates of Va.Code Ann. § 18.2–500, the magistrate judge awarded treble damages to Adelphia, including lost profits, and attorney's fees. In addition, Adelphia was awarded injunctive relief against CQC and Alcova. *See* Va.Code Ann. § 18.2–500(b).

*Greenspan* was recently reaffirmed in *CBS*. There, the Virginia Supreme Court specifically rejected the "contention that the conspiracy statutes require proof of actual malice." *CBS*, 453 S.E.2d at 266–67. The court went on to state that the conspiracy statutes "merely require proof of legal malice, *i.e.*, that[the defendant] acted intentionally, purposely, and without lawful justification." *Id.* Finally, the court opined that, "as a general proposition, the conspiracy statutes [do not] require proof that a conspirator's primary and overriding purpose is to injure another in his trade or business." *Id.* Accordingly, under *Greenspan* and *CBS*, CQC's argument that it did not possess the requisite malice is without merit.[3]

■ Next, CQC contends that it cannot be liable for attempting to conspire. According to CQC, the statutory language itself does not support a finding of liability against a party for attempting to conspire. This argument fails for the simple reason that § 18.2–499(B) *does* specifically prohibit a party from attempting to procure the participation of others in an attempt to wilfully and maliciously injure another. Thus, the plain language of § 18.2–499(B) contemplates that a party can be liable for attempting to conspire. *See* § 18.2–499(B) ("Any person who *attempts* to procure the participation ... of any one or more persons to enter into a [conspiracy] ... shall be guilty of a violation of this section ....") (emphasis added); *see also Greenspan*, 351 S.E.2d at 34–35 (affirming liability award for attempt to conspire pursuant to § 18.2–499(B)).

■ Third, in a related argument, CQC argues that it cannot be liable for statutory conspiracy because there is no evidence in the record demonstrating that another party, acting with legal malice, conspired with CQC. This argument fails because § 18.2–499(B) does not require that the co-conspirator act with legal malice. Rather, the statute simply requires that one party, acting with legal

malice, conspire with another party to injure the plaintiff. Here, the evidence clearly demonstrated that CQC acted with legal malice when it conspired with Alcova and the MDU owners for the purpose of injuring Adelphia.

■ Finally, CQC argues that there is insufficient evidence in the record demonstrating that it violated Virginia's statutory conspiracy law. At the bench trial, the evidence demonstrated that CQC wanted to drive Adelphia completely out of the Charlottesville cable market by any means necessary. To accomplish that goal, CQC engaged in an aggressive negative advertising campaign against Adelphia, destroyed Adelphia's property, cut off Adelphia's service to its customers without notifying Adelphia that it was doing so, and offered the illegal kick-backs to Alcova. This evidence constitutes clear and convincing evidence that CQC procured the participation of others to maliciously harm Adelphia's business reputation in Charlottesville and that CQC's actions caused Adelphia to suffer damages. Accordingly, the evidence is sufficient to support the magistrate judge's decision holding CQC liable under Virginia's statutory conspiracy law.

### III.

Having determined that there was sufficient evidence to hold CQC liable for statutory conspiracy, we now turn to the magistrate judge's award of damages in the amount of $151,500 to Adelphia. The major portion of that amount, $143,300, constituted damages for the defendants' conspiracy to tortiously interfere with Adelphia's business. The award of damages constituted Adelphia's lost profits for the entire period of its franchise license with Charlottesville. Because CQC statutorily conspired, the $143,300 was trebled against it. The magistrate judge also awarded Adelphia $8,200 for damages to its tangible personal property (conversion). The

**3.** The cases cited by CQC for the proposition that injuring Adelphia's business must have been its overriding purpose were all decided *before CBS* and are, therefore, no longer controlling. *See, e.g., Petra Int'l Banking Corp. v. First Am. Bank of Va.*, 758 F.Supp. 1120 (E.D.Va.1991), *aff'd sub nom. Petra Int'l Banking Corp. v. Dameron Int'l Inc.*, 953 F.2d 1383 (4th Cir.1992); *Nationwide Mut. Fire Ins. Co. v. Jones*, 577 F.Supp. 968 (W.D.Va.1984); *In re Landbank Equity Corp.*, 66 B.R. 949 (Bankr.E.D.Va.1986), *aff'd in part and remanded in part on other grounds*, 83 B.R. 362 (E.D.Va.1987).

conversion damages were not trebled against any defendant. In addition, the magistrate judge awarded Adelphia $10,000 in punitive damages against CQC. Finally, the magistrate judge voided the kick-back agreement between CQC and Alcova and enjoined any similar future agreement. CQC makes several arguments attacking the magistrate judge's award of damages to Adelphia. We shall address each of these arguments in turn.

### A.

First, CQC argues that Adelphia suffered no damages once the kick-back agreement with Alcova was voided and Adelphia could compete with CQC on equal footing. We rejected this very argument in *CQC III*. In that case, CQC argued, as it does here, that the magistrate judge erred when he awarded damages for the entire period of Adelphia's cable franchise license with Charlottesville.[4] In rejecting this argument, we noted that it was permissible and not too speculative to tie Adelphia's business expectancy to the time period of its franchise rights with Charlottesville. *See CQC III*, 65 F.3d at 1125. We see no reason to disturb that holding now, especially in light of the fact that, while there were some differences in the testimony presented on damages by Adelphia and CQC between this case and *CQC III*, the same two damages experts testified for Adelphia and CQC in both cases.

### B.

CQC also argues that awarding injunctive relief to Adelphia in addition to the trebled $143,300 in damages constituted an impermissible double recovery. According to CQC, regardless of any business expectancy Adelphia might have had which exceeded the MDU tenant lease terms, once the magistrate judge awarded injunctive relief on September 13, 1995, which prohibited any future tortious interference, Adelphia could no longer prove it lost any profits, nor that any contract it had with the MDU owners was being tortiously interfered with by CQC. This argument has no merit because it ignores the fact that the negative effects of CQC's actions did not completely evaporate once competition was ordered back into the Charlottesville cable television service market by the magistrate judge. In effect, CQC has "poisoned Adelphia's well." Thus, CQC cannot escape the simple truth that its actions caused Adelphia damages through the entire period of Adelphia's franchise license with Charlottesville. In short, even with the imposition of the injunction on future kick-back agreements and the voiding of the existing kick-back agreement between CQC and Alcova, the effect of CQC's actions against Adelphia remained. Accordingly, the compensatory and treble damages award does not constitute a double recovery when coupled with the injunction.

### C.

Finally, CQC argues that the magistrate judge erred when he awarded $10,000 in punitive damages against CQC after trebling the damages of $143,300 against CQC. We agree.

Because the trebling of damages is itself punitive in nature, *see Porter v. Wilson*, 244 Va. 366, 421 S.E.2d 440, 443 (1992) (noting that treble damages are intended to be a penalty and are therefore disfavored), the additional punitive damages award of $10,000 was erroneous because it represented a double recovery for Adelphia on Adelphia's statutory conspiracy claim, *see Tazewell Oil*, 413 S.E.2d at 621 (court upheld a trial judge who vacated a jury's punitive damages award because the jury also found the defendant liable for statutory conspiracy); *cf. Greenspan*, 351

---

4. At the time the trial was conducted by the magistrate judge in *CQC III*, Adelphia had six years remaining on its cable franchise license with Charlottesville. The magistrate judge added an additional five years to that period which represented the likely extension Adelphia would receive on its license from Charlottesville. Thus, the damages awarded to Adelphia in *CQC III* contemplated an eleven-year period during which Adelphia sufficiently proved it would suffer prospective lost profits. *See* 65 F.3d at 1125. In keeping with that ruling, in this case, the magistrate judge based Adelphia's business expectancy on a 9 1/2 year period (the time then remaining on Adelphia's existing franchise license combined with the likely five-year renewal period).

S.E.2d at 36 (because treble damages were awarded, the Virginia Supreme Court did not consider any additional arguments related to tortious interference). Accordingly, we vacate the award of punitive damages.

## IV.

For the reasons stated above, we affirm the magistrate judge's decision holding CQC liable for violating Virginia's statutory conspiracy law. We also affirm the award of damages to Adelphia in all respects except the punitive damages award which we vacate.

*AFFIRMED IN PART AND VACATED IN PART.*