# CIRCUIT COURT OF WARREN COUNTY

Am-Cor.Com, Inc.

v.

Donald A. Stevens et al.

July 3, 2001

Case No. (Chancery) 01-108

BY JUDGE JOHN E. WETSEL, JR.

This case came before the Court on July 3, 2001, on the Plaintiff's Motion for a Temporary Injunction. Jane C. Clarke and Bryan Bright, Esquires, appeared for the Plaintiff; and Murray L. Deutchman, Esquire, appeared for the Defendants. Whereupon, evidence was heard and argued. Upon consideration whereof, the Court has decided to grant the Motion for a Temporary Injunction in part and to deny it in part for the following reasons.

## I. *Statement of Facts*

The following facts are found by the greater weight of the evidence.

Plaintiff Am-Cor is a Virginia corporation engaged in the development, design, and sale of a unified steel and cement system denominated as "Am-Cor Systems." Am-Cor was formed in 2000. Since its formation, it has completed one contract. However, it alleges that the Defendants are attempting to enter into contracts with potential customers of Am-Cor and that the

246

defendants, among other things, have wrongfully converted property which belongs to Am-Cor.

The Defendant Donald Stevens was a member of the Plaintiff's Board of Directors from August 15, 2000, until April 30, 2001. He was the Plaintiff's president from August 15, 2000, until February 26, 2001. Defendant Donald Stevens is an architect, but he is not a licensed architect. He is also a builder. Preceding his association with Am-Cor, he had designed and built about six buildings. He had had no prior experience with steel framing and ferro-cement until a client expressed interest in constructing a house using such a system and Stevens then contacted MacDonald; this was the Cabin John residence addition. He later became associated with MacDonald, and his practical knowledge of ferro-cement systems derives from his experience with MacDonald. While associated with MacDonald, Donald Stevens build a house on the Isle of Wight, Maryland, a tribal structure in Oklahoma, and a residential addition in Cabin John, Maryland, all three of which used the MacDonald patented system.

Defendant Andrea Stevens is Donald Stevens' wife, and she was a member of the Plaintiff's Board of Directors from August 15, 2000, until April 30, 2001. She was the Plaintiff's vice-president from August 15, 2000, until February 26, 2001.

Defendant Mermelstein was employed by the Plaintiff as a consultant from February 2001 until he resigned on April 17, 2001.

On April 9, 2001, Donald Stevens' father, who was an investor in Am-Cor, told Donald that it appeared that Am-Cor would have no contracts with LJK Alliance and Cottage Grove. On April 12, 2001, Donald Stevens received the e-mail notice from MacDonald to terminate the lease and shut Am-Cor's business in Front Royal down.

On April 17, 2001, the Stevenses and MacDonald met and discussed Donald Stevens removal from the Board and his termination from Am-Cor.

Defendant Insteel International was incorporated on April 16, 2001, by the Defendants Stevens and Mermelstein. Insteel is potentially a competitor of the Plaintiff, but it too is a fledgling corporation which has yet to enter into a contract or to generate any gross income. Insteel is now using a cement formula which it acquired from Portland Cement in its ferro-cement system, and it was not proven that the Insteel system violates the MacDonald patent.

Angus MacDonald, an officer and member of Am-Cor's Board of Directors, has a patent on a "steel and cement panel," but the Defendants deny that they are using this panel in their marketing or that they plan to market it in the future and that their steel and cement construction system is one which they themselves have developed. Angus MacDonald is a licensed, professional

architect. He is a principal in an architectural firm, which specializes in ferro-cement construction, which was first used in 1849. Ferro-cement differs from traditional construction primarily because the concrete skin is part of the load bearing wall of the building. MacDonald developed a patent on a ferro-cement panel, which differs from traditional ferro-cement systems, because in the Am-Cor system, the cement is forced through the steel mesh and bonds directly with the light-weight steel frame. In the traditional system, the ferro-cement skin is a non-structural component, because there is no direct bond between the steel frame and the ferro-cement skin. See the Portland Cement Brochure for an illustration of the traditional system. The unique features of the Am-Cor system are (1) its use of MacDonald's patented panel, which the Defendants agree not to use, (2) the on-site method by which MacDonald applies the ferro-cement skin to the prefabricated steel panels to produce a monocoque wall, and (3) the embedding of the vertical wall panels in the concrete floor slabs.

One of the Plaintiff's major complaints is that the Defendants have usurped Am-Cor's business opportunities about which they acquired knowledge while at Am-Cor. These opportunities, listed roughly in order of their degree of maturation as of the time that the parties severed their relationship, are as follows:

a. *Domino's*. MacDonald developed a standard set of plans for free standing Domino franchise buildings. Defendants do not plan to submit any proposals to Domino's.

b. *LJK Alliance Group*. Donald Stevens was the Am-Cor contact for this customer. MacDonald and Stevens went to Mexico twice at Am-Cor's expense, once in January and once in March, to make presentations with respect to a large housing project in Mexico. MacDonald prepared a marketing submission in December 2000, which was submitted to LJK Alliance. The parties had substantial negotiations, and by mid-April they were discussing entering a contract. Insteel has pursued a relationship with LJK, and it is the potential relationship between LJK and Insteel that is the major issue in this case. After Donald Stevens left Am-Cor, LJK contacted Stevens about working on the Mexican project.

c. *Fire Station No. 10*. MacDonald reviewed the plans, which had been prepared by a Warren County architect who had no association with the parties and which were sent to MacDonald by the Warren County Administrator, and MacDonald changed the plan to a two-story structure. The County Administrator ultimately gave a copy of MacDonald's plans to Donald Stevens after Insteel was formed.

d. *Marshall Ford*. Donald Stevens and Mermelstein were MacDonald's agents for this project. MacDonald prepared a concept drawing of this facility, and later more extensive plans were prepared by a designer employed by Marshall Ford, and these were sent to Insteel.

Plaintiff alleges that the individual defendants have breached fiduciary duties owed by them to Plaintiff, have entered a prohibited statutory conspiracy to injure the plaintiff, and have violated the Uniform Trade Secrets Act, all of which have allegedly caused damage to the Plaintiff, and all of which is denied by the Defendants.

There are no covenants not to compete in this case.

## II. *Conclusions of Law*

Restraints on an employee in the exercise of a gainful occupation "are not favored in the law and courts are slow to grant injunctive relief." *Stoneman v. Wilson*, 169 Va. 239, 245, 192 S.E. 816 (1937) (construing covenant not to compete). *See also Clinch Valley Physicians, Inc. v. Garcia*, 243 Va. 286, 289, *quoting with approval Linville v. Servisoft of Va.*, 211 Va. 53, 55, 174 S.E.2d 785 (1970) (Covenants not to compete are carefully examined and strictly construed before the covenant will be enforced.).

"The usual rule is that a former employee, after termination of his employment, may compete with his former employer, the only restraint being that he may not use the confidential information or trade secrets obtained from the former employer, appropriating, in effect, to his competitive advantage what rightfully belongs to his employer." *Community Counseling Services, Inc. v. Reilly*, 317 F.2d 239, 244 (4th Cir. 1963). "Moreover, it is not unusual in the business world for an employee to leave his employment and start a competing business. When this occurs, inevitably customers of the former employer will desire to continue to deal with the former employee in the new business." *Pearce v. Conway*, 246 Va. 278, 282, 435 S.E.2d 133 (1993).

In *Dionne v. Southeast Container & Packaging, Inc.*, 240 Va. 297, 303-04, 397 S.E.2d 110 (1990), the Supreme Court discussed the nature of a trade secret in the context of enforcing an employer's confidentiality agreement and the Uniform Trade Secrets Act, Virginia Code § 59.1-336 *et seq.*, against his former employee:

Pierre's first contention misapprehends the nature of a trade secret. The crucial characteristic of a trade secret is secrecy rather than novelty. *See generally, Developments in the Law — Competitive*

*Torts*, 77 Harv. L. Rev. 888, 949-50 (1964); Comment, *The Stiffel Doctrine and The Law of Trade Secrets*, 62 Nw. U. L. Rev. 956, 969 (1968). The secrecy need not be absolute; the owner of a trade secret may, without losing protection, disclose it to a licensee, an employee, or a stranger, if the disclosure is made in confidence, express or implied. *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 475 (1974). Although the subject of a trade secret may be novel in the sense that it is something generally unknown in the trade or business, "novelty, in the patent law sense, is not required for a trade secret." *Id.* at 476. Indeed, a trade secret "may be a device or process which is clearly anticipated in the prior art or one which is merely a mechanical improvement that a good mechanic can make." Restatement of Torts, § 757, comment b (1939).

### Breach of Fiduciary Duty

An employee's fiduciary duty to his employer prohibits the employee from acting in a manner adverse to the employer's interest. *Hilb, Rogal and Hamilton Co. v. DePew*, 440 S.E.2d 918, 921 (1994); *Greenspan v. Osheroff*, 232 Va. 388, 400, 351 S.E.2d 28, 37 (1986).

As directors and officers of Am-Cor, the Stevenses had a fiduciary duty to the Am-Cor corporation to act in good faith in the best interest of the corporation. Virginia Code § 13.1-690. They had the same duties of fidelity in dealing with the corporation as between a trustee and a beneficiary of a trust. A director of a private corporation cannot directly or indirectly, in any transaction in which he is under a duty to guard the interest of the corporation, acquire any personal advantage or make any profit for himself. *Giannotti v. Hamway*, 239 Va. 14, 387 S.E.2d 725 (1990).

"It is a cardinal principle that a director or an officer of a corporation may not be permitted to make a secret profit out of his official position; he must give the corporation the benefit of any advantage which he has thereby obtained." 18B Am. Jur. 2d, *Corporations*, § 1713. This principle applies to that situation where a business opportunity, which properly belonged to the corporation, has been usurped by a director or officer.

While it is true that the "the officers and directors of a going solvent corporation cannot engage in a competing business to the detriment of the corporation which they represent," 18B Am. Jur. 2d, *Corporations*, § 1712, a former officer or director is not precluded from forming and engaging in a competing business, absent an enforceable covenant not to compete.

As noted in 18B Am. Jur. 2d, *Corporations*, § 1713:

The fact that one was once a director or an officer of a corporation does not preclude his engaging in a business similar to that conducted by the company. It is said that it is a common occurrence for corporate fiduciaries to resign and form a competing enterprise and that unless restricted by contract; this may be done with complete immunity, because freedom of employment and encouragement of competition generally dictate that such persons can leave their corporation at any time and go into a competing business. It is recognized that in doing so they can use in their own enterprise the experience and knowledge they gained while working for their former corporation, and that they can, at least in the absence of a contract provision to the contrary, solicit the customers of their former corporation for business unless the customer list is itself confidential.

While the Am-Cor customer list may be Am-Cor's property, it was not proven that the customer list was a trade secret.

In considering whether to issue a temporary injunction, courts generally consider (1) the plaintiffs' likelihood of success on the merits; (2) the likelihood of irreparable harm to the plaintiffs if the temporary injunction is denied; (3) the likelihood of harm to the defendants if the requested relief is granted; and (4) the public interest. *See Christian Defense Fund v. Stephen Winchell & Assocs., Inc.*, 47 Va. Cir. 148 (Fairfax 1998), applying federal injunction standard of *Rum Creek Coal Sales, Inc. v. Caperton*, 926 F.2d 353 (4th Cir. 1991).

As a general rule, proof of irreparable damage is absolutely essential to the award of injunctive relief. *Carbaugh v. Solem*, 225 Va. 310, 314, 302 S.E.2d 33, 35 (1983). The concept of irreparable harm is premised on the lack of an adequate remedy at law. *See Black & White Cars, Inc. v. Groome Transp., Inc.*, 247 Va. 426, 431-32, 442 S.E.2d 391, 395 (1994). The party seeking relief must show that the alleged harm is imminent, and not merely speculative or potential. *See Ridgwell v. Brasco Bay Corp.*, 254 Va. 458, 462-63, 493 S.E.2d 123, 125 (1997).

In Count IV of their bill of complaint, the Plaintiff's ask to impose a trust on Insteel's revenues, but to date the plaintiff has had only one contract and the defendant none. Given the nascent nature of their respective businesses, it is highly speculative as to whether the two corporate parties will ever generate any substantial income. Moreover, it will require substantial technical evidence to compare the Am-Cor system with the Insteel system. If the Am-Cor system is truly unique or protected by the Trade Secrets Act, then no one can use it except Am-Cor, and if it is later determined that the Defendants are

liable to the Plaintiff on the Station 10 project, then damages will provide an adequate remedy for past losses and an injunction will protect against future losses.

While the Mexican project is highly problematic, it presently appears that it is a business expectancy which belonged to Am-Cor since the Defendants learned of this opportunity, pursued it, and developed it to a significant extent while they were officers and employees of Am-Cor.

## III. *Decision*

For the foregoing reasons, it is adjudged and ordered that:

1. The Plaintiff's Motion for a Temporary Injunction is granted with respect to:

a. Defendants may not use the Am-Cor Brochure or its contents in any manner.

b. Defendants may not use Am-Cor pictures, plans, drawings, documents, personal property, or the Am-Cor patented ferro-cement panel in any manner. The Am-Cor system employs the Am-Cor patented ferro-cement panel, but it is not proven that the non-patented aspects of the Am-Cor system are a trade secret.

c. Defendants may not represent that they are the successor in interest to Am-Cor or represent that Am-Cor's buildings were constructed by Insteel.

d. Defendants may not have any further contact with LJK Alliance or any group or agent affiliated with LJK about the construction of the project in Mexico which was the subject of the December 2000 marketing submission.

e. Defendants may not have further contact with Marshall Ford with respect to its new facility.

f. Defendants shall not construct any buildings using ferro-cement skins for Domino's.

2. This temporary injunction is conditioned upon the Plaintiff's executing a bond in the amount of $50,000 cash or solvent surety approved by the Clerk of the Court conditioned upon Plaintiff's paying to the Defendants any and all damages which they may sustain if it shall be determined that Defendants have been wrongfully restrained from contacting or contracting with LJK and for the costs incurred by the Defendants in this suit.

3. Plaintiff's Motion for a Temporary Injunction is otherwise denied. Specifically, the Defendants may bid on the Warren County Station 10 Project and the RR Caribbean project.

4. This case is continued to August 20, 2001, at 2:00 p.m. for a thirty minute pretrial conference and to determine whether the injunction should be enlarged or dissolved.